IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

COLLEGENET, INC., a Delaware   )
corporation,                   )
                               )
                Plaintiff,     )    Nos. CV-02-484-HU (LEAD CASE)
                               )         CV-02-1359-HU
        v.                     )
                               )
APPLYYOURSELF, INC., a         )    OPINION & ORDER
Delaware corporation,          )
                               )
                Defendant.     )
                               )

Kristin L. Cleveland
Joseph T. Jakubek
John D. Vandenberg
KLARQUIST SPARKMAN, LLP
121 S.W. Salmon Street, Suite 1600
Portland, Oregon 97204

     Attorneys for Plaintiff

Kathleen C. Bricken
GARVEY SCHUBERT BARER
121 S.W. Morrison Street
Portland, Oregon 97204-3141

Lawrence E. Carr III
Raymond C. Jones
CARR, MORRIS & GRAEFF, P.C.
1120 G Street, N.W., Suite 930
Washington, D.C. 20005

     Attorneys for Defendant

1 - OPINION & ORDER

HUBEL, Magistrate Judge:

Plaintiff brings claims of patent infringement in these consolidated cases. In case number CV-02-484-HU, plaintiff alleges infringement of plaintiff's patent number 6,345,278 ("the '278 patent") by defendant ApplyYourself. In case number CV-02-1359-HU, plaintiff alleges infringement of plaintiff's patent number 6,460,042 ("the '042 patent") by defendant ApplyYourself. The '042 patent is a continuation patent of the '278 patent. Exh. 1 to Apr. 21, 2003 Bricken Affid. at pp. 1, 34 (Col. 1, lines 4-5)[1]. In both cases, defendant raises invalidity as one of several affirmative defenses and counterclaims for a declaratory judgment of invalidity and noninfringement.

On December 19, 2002, I issued an Opinion construing the claims in the '278 patent. Claim construction issues pertaining to the claims in the '042 patent were deferred.

Presently, defendant moves for summary judgment on its invalidity affirmative defense and counterclaim as to certain claims of the '042 patent. Plaintiff moves for summary judgment as to the literal infringement of certain claims of the '278 patent and the '042 patent. For the reasons explained below, I deny defendant's motion and I grant in part and deny in part plaintiff's motion.

                              STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a

---

[1] References to the '042 patent will be to this exhibit and will be denoted simply by the column and line number referred to, such as 1:4-5.

2 - OPINION & ORDER

1    matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the
2    initial responsibility of informing the court of the basis of its
3    motion, and identifying those portions of "'pleadings, depositions,
4    answers to interrogatories, and admissions on file, together with
5    the affidavits, if any,' which it believes demonstrate the absence
6    of a genuine issue of material fact."  Celotex Corp. v. Catrett,
7    477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

8        "If the moving party meets its initial burden of showing 'the
9    absence of a material and triable issue of fact,' 'the burden then
10   moves to the opposing party, who must present significant probative
11   evidence tending to support its claim or defense.'"  Intel Corp. v.
12   Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991)
13   (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th
14   Cir. 1987)).  The nonmoving party must go beyond the pleadings and
15   designate facts showing an issue for trial.  Celotex, 477 U.S. at
16   322-23.

17       The substantive law governing a claim determines whether a
18   fact is material.  T.W. Elec. Serv. v. Pacific Elec. Contractors
19   Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  All reasonable doubts as
20   to the existence of a genuine issue of fact must be resolved
21   against the moving party.  Matsushita Elec. Indus. Co. v. Zenith
22   Radio, 475 U.S. 574, 587 (1986).  The court should view inferences
23   drawn from the facts in the light most favorable to the nonmoving
24   party.  T.W. Elec. Serv., 809 F.2d at 630-31.

25       If the factual context makes the nonmoving party's claim as to
26   the existence of a material issue of fact implausible, that party
27   must come forward with more persuasive evidence to support his
28   claim than would otherwise be necessary.  Id.; In re Agricultural

3 - OPINION & ORDER

1  Research and Tech. Group, 916 F.2d 528, 534 (9th Cir. 1990);

2  California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics,

3  Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).

4                              DISCUSSION

5  I.  Defendant's Motion for Summary Judgment

6      A.  Brief Overview of the '042 Patent

7      The abstract of the patent explains the patent as follows:

        A forms engine allows data sharing between customizable
        on-line forms, such as college admissions applications.
        Before applying, an applicant opens an account with a
        third party application servicer.  After the applicant
        completes an application for one institution, the data is
        saved in a data base and automatically populates fields
        in subsequent application forms.   The form for each
        institution is created from a form description file.
        Each form is branded for its institution and forms for
        different institutions differ in appearance and content
        so that the presence of the third party servicer is
        transparent to the applicant.

        The system is extensible without programming, allowing
        new applicant attributes to be readily incorporated into
        the system and allowing the content and appearances of
        the application to be readily changed by changing the
        description file.   The use of aliases for applicant
        attributes permits data to be readily shared between
        forms even though labeled and arranged differently on
        different forms. Information stored about each attribute
        allows the specification of data validation rules and
        data sharing and grouping rules, as well as dependency
        rules that permit application page content to depend on
        applicant's responses on a previous page.

21  Exh. 1 to Apr. 21, 2003 Bricken Affid. at p. 1.

22      The patent has forty-four claims.  Defendant challenges the

23  validity of claims 1-39 and 41-44.  Claims 1, 16, 32, and 38 are

24  independent claims.  Claims 1 and 16 are similar and provide a

25  method for processing forms over a computer network. Claim 32

26  discloses a system for performing a method similar to that seen in

27  independent claim 16.  Claim 38 is a method claim similar to claim

28  16, but it is set forth in the context of what an institution would

4 - OPINION & ORDER

1  receive from its interaction with the forms engine.

2      As noted by defendant, the attributes of the '042 patent are
3  fairly consistent across the independent claims and include the
4  following general features: (1) presenting a customized form to an
5  applicant; (2) allowing the applicant to enter user and payment
6  information; (3) receiving the user and payment information; (4)
7  processing the user and payment information; and (5) sending the
8  user information back to the institution in a format specified by
9  the institution.

10     The dependent claims further define the form in various ways:
11  (1) as having multiple pages, as seen in claims 6, 21, 33, and 43;
12  (2) providing for data validation at the client computer or after
13  each page of the multiple page application is posted, as seen in
14  claims 7, 8, 10, 11, 14, 22, 23, 25, 27, 30, and 33; (3) providing
15  for further data validation at the server level or when the
16  application is completed, as seen in claims 8, 10, 11, 12, 14, 23,
17  25, 27, 28, 30, 34, and 35; and (4) providing for automatic data
18  population between multiple application forms, as seen in claims 4,
19  19, 36, 37, and 41.

20     Defendant argues that claims 1-39 and 41-44 are invalid for
21  two reasons. First, defendant contends that they are invalid under
22  35 U.S.C. § 102(b) because they were anticipated by a similar
23  system which was on sale more than one year before the date of the
24  '042 patent application. Second, defendant alternatively argues
25  that claims 1-37 are invalid under 35 U.S.C. § 112 because they are
26  vague and indefinite.

27     B.  35 U.S.C. § 102(b) - On-Sale Bar

28     The relevant part of the statute provides that

5 - OPINION & ORDER

[a] person shall be entitled to a patent unless . . . (b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

35 U.S.C. § 102(b). The provision is referred to as the "on-sale bar" doctrine. The '042 patent has a provisional patent application filing date of June 4, 1998. Exh. 1 to Apr. 21, 2003 Bricken Affid. at p. 1. One year before that date is June 4, 1997. In an on-sale bar analysis, that date is the "critical date."

One of the primary purposes of the on-sale bar is to prohibit the withdrawal of inventions that have been placed into the public domain through commercialization. Abbott Labs. v. Geneva Pharms., 182 F.3d 1315, 1319 (Fed. Cir. 1999). Policies underlying the on-sale bar include (1) discouraging removal of inventions from the public domain which the public justifiably comes to believe are freely available; (2) favoring prompt and widespread disclosure of inventions; (3) giving the inventor a reasonable amount of time following the sales activity to determine the value of a patent; and (4) prohibiting an extension of the period for exploiting the invention. Envirotech Corp. v. Westech Eng'g, Inc., 904 F.2d 1571, 1574 (Fed. Cir. 1990).

To establish an on-sale bar, defendant must show that the product sold "fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art." Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1352 (Fed. Cir. 2002) (internal quotation omitted). If the product contains all the elements of the claimed invention, then defendant must additionally show that before the critical date, the invention was both (1) the subject of a commercial offer for sale not

6 - OPINION & ORDER

1  primarily for purposes of experimentation; and (2) ready for

2  patenting.  Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 67 (1998).

3       The "ultimate determination of whether an invention was on

4  sale under 35 U.S.C. § 102(b) is a question of law[.]"  Allen

5  Eng'g, 299 F.3d at 1344.  The legal determination is, however,

6  based on underlying facts.  Id.  Defendant must prove the facts

7  underlying the two-part Pfaff test by clear and convincing

8  evidence.  Id. at 1351.

9            1.  Full Anticipation of the Claimed Invention

10      As suggested above, even before performing the two-part

11 analysis under Pfaff, defendant must show that the product that was

12 "on-sale" anticipated every claim of the patented invention.  The

13 "assessment of whether a device sold was an embodiment of a claimed

14 invention" is "the first determination" in an on-sale bar analysis.

15 Id. at 1353.

16      Defendant does not contend that plaintiff itself sold the

17 invention of the '042 patent before the critical date.  Rather,

18 defendant argues that a system designed by a third party and used

19 by institutions of higher education before the June 4, 1997

20 critical date, invalidates plaintiff's '042 patent.  Activities

21 from a third party can invoke the on-sale bar.  See, e.g., Abbott

22 Labs., 182 F.3d at 1318 (third party sale prior to critical date

23 rendered patent invalid).

24      XAP Corporation is a competitor of plaintiff's and defendant's

25 in the on-line college admissions application market.  In the late

26 1980s, XAP's Chief Executive Officer, Allen Firstenberg, developed

27 a program for electronic admissions applications for universities.

28 The initial program was disk-based.  Eventually, XAP began to

7 - OPINION & ORDER

develop an on-line version of its disk-based application. Defendant represents that in 1996, XAP developed an on-line college admissions application system. Defendant states that in November 1996, the California State University system (CSU), went on-line with the XAP Online System.

There appears to be no serious dispute by plaintiff that some version of the XAP Online System began operation at CSU in November 1996. What plaintiff does dispute, however, is whether certain parts of the XAP Online System anticipated the '042 patent before the critical date.

a. Terms of the Agreement Between CSU and XAP

According to Firstenberg, XAP sold CSU its system on August 19, 1996. Apr. 18, 2003 Firstenberg Affid. at ¶ 6. The contract states that XAP agreed to "furnish services for the development and subsequent operation of an electronic university student application and information service in accordance with the General Terms and Conditions and the following Riders[.]" Exh. 2 to May 5, 2003 Cleveland Declr. at p. CNA07632. The term of the agreement ran from August 30, 1996 to August 29, 1999. Id. XAP was to receive $674,328 over the term of the agreement. Id. Incorporated by reference into the agreement is the eight-page General Terms and Conditions, and seven riders covering scope of work, deliverable descriptions and costs, software license, software ownership rights, software holding and access agreement, the request for proposal, and the contractor's proposal. Id.

In the Scope of Work rider, the service to be performed is described as follows:

Contractor shall design and produce an Electronic

8 - OPINION & ORDER

Application and Student Information system in accordance with the General Terms and Conditions, and Riders in this Agreement.  The contract is divided into three phases. The first phase is a developmental phase where all components of the systems shall be designed, developed, and implemented.

The second and third phases are operational with some new development or systems improvements being anticipated. It is anticipated that each phase of the project will last one year.

Id. at p. CNA07641.

b.  Functions of XAP System

According to defendant, the XAP Online System performed every claim limitation seen in claims 1-39 and 40-44 of the '042 patent. Deft's Concise Stmt of Facts at ¶ 8.  In support of this statement, defendant relies on XAP documents, statements made by Firstenberg in his deposition, an affidavit from Firstenberg, and an affidavit from Frank Tansey, chief technical representative for CSU for the "CSUMentor System," the name ascribed to the XAP Online System by CSU.

Plaintiff argues that there is a material issue of fact as to whether the XAP Online System had the ability to perform several functions disclosed in the '042 patent.  I agree with plaintiff.

i.  Customized Data Delivery/Mapping

In claims 1, 16, 32, 38, 39, 41, 42, and 43, the '042 patent claims that the third party forms servicer processes the user information in accordance with the preferences of the institution of higher education to which the form is directed, to make the user information available to the institution in a format specified by the institution.  35:34-38; 36:49-51; 38:1-3; 38:43-45; 38:62-67; 39:6-12; 40:5-9; 40:10-16.  Defendant argues that the XAP Online System performed this same function before the critical date.

9 - OPINION & ORDER

1    There appears to be no dispute that the XAP Online System
2    processed the user information.  In support of the contention that
3    the XAP Online System provided the user information to the
4    institution in a format specified by the institution for easy
5    upload into the institution's Student Information System (SIS), XAP
6    relies on several documents contained in Exhibit 2 to Bricken's
7    April 21, 2003 Affidavit.[2]

8    Defendant's evidence shows that the XAP Online System provides
9    user information to the institution in a format specified by the
10   institution, but that the choice of formats is limited.  Exh. 2 to

11

12   [2] It is worth noting that defendant fails to adequately
13   identify the documents in this exhibit.  Other than the statement
     in Bricken's affidavit that Exhibit 2 contains "true and accurate
14   copies of records from XAP Corporation[,]" no other
     identification of the exhibit's seventy-three pages is provided.
15   For example, defendant cites to page forty-eight of the exhibit
     in support of its position that the XAP Online System provided
16   user information to the institution in a format specified by the
     institution before the critical date.  When turning to this page,
17   the Court sees that it is page fifty-five of an unidentified,
     undated, document concerning the XAP Online System at CSU.  Pages
18   one through fifty-four do not precede page fifty-five and it is
     impossible to tell the origin of the cited document.  This also
19   occurs when defendant cites to page fifty-eight of the exhibit.
     This page appears to be page eighteen of a different undated,
20   unidentified document.  There are no prior pages for this
     document.
21
     Defendant also fails to highlight or underscore the relevant
22   sections of the deposition pages of Firstenberg's deposition in
     Exhibit 3 to the April 21, 2003 Bricken Affidavit.  For example,
23   defendant refers to page nine of Exhibit 3 (page sixteen of the
     deposition), but there is no indication on that page of what
24   lines are relevant.  This violates Local Rule 56.1(c)(3)
     (requiring that relevant portions of the documents referenced in
25   the concise statement must be highlighted).
26
     Not only does defendant's practice create unnecessary work
27   for the Court, reliance on undated, unidentified documents does
     not demonstrate clear and convincing evidence of the absence of a
28   material issue of fact.

10 - OPINION & ORDER

1   Apr. 21, 2003 Bricken Affid. at p. 48 (unidentified, undated

2   document discussing the upload of user information to CSU's SIS and

3   the ability of XAP to convert the information from the XAP data

4   format to "Transaction Set 189" as part of its system, but noting

5   that additional mapping was the responsibility of each CSU campus);

6   Id. at p. 27 (unidentified, undated graphic representation of

7   available data formats for the transmission of user information

8   from the "Mentor Server" to the CSU campus's SIS; data format

9   options depicted are tab delimited, carriage return delimited,

10  comma delimited, fixed length, or ANSII X12 TS 189); Exh. 3 to Apr.

11  21, 2003 Bricken Affid. (Firstenberg Depo.) at p. 9 (noting that in

12  July 1997, XAP transferred data from its servers to individual

13  schools in various formats depending on the university and noting

14  three available formats:  fixed flat file, fixed-length flat file,

15  or tabbed limited); Tansey Apr. 18, 2003 Affid. at ¶ 9(v) (noting

16  that the XAP Online System which began operation on November 1,

17  1996, included the function of XAP transmitting user information to

18  the particular university in a format specified by the university

19  and noting the common formats of tab or comma delimited and faxed

20  format).

21      Once the university receives the user information in one of

22  the limited number of formats offered as part of the XAP Online

23  System, the university would then need to do additional "mapping"

24  of the data to make it usable by the university's SIS.  See Exh. 7

25  to May 5, 2003 Cleveland Declr. (Firstenberg Depo.) at pp. 19-20

26  (noting that  XAP could provide a data mapping service so that its

27  clients could "map" from the formats provided as part of XAP's

28  Online System and convert the information to the SIS; further

11 - OPINION & ORDER

noting that the conversion took place at the university with conversion software sometimes written by the university itself or by hiring XAP to do it); Tansey Apr. 18, 2003 Affid. at ¶ 9(v) (noting that XAP could accommodate formats other than the common formats provided as part of the XAP Online System, for an additional charge); Exh. 2 to May 5, 2003 Cleveland Affid. at p. CNA07651 (indicating that the August 1996 Agreement between XAP and CSU provided that XAP could provide SIS mapping software to CSU, but at an additional cost).

The evidence suggests that the function provided by XAP's Online System before the critical date encompassed providing user information data to CSU in one of a finite number of formats with CSU still needing to "map" the information from the format in which it was received, to the institution's SIS.  Although that additional mapping could be provided by XAP, it was not part of the August 1996 contract between XAP and CSU and there is no evidence noted in the record that any campus hired XAP to provide that additional mapping for an additional charge, before the critical date.

The function as described is distinct from that claimed in the '042 patent.  As indicated above, the claim language indicates that the processing of the user information is by the third party forms servicer and is done in a format specified by the institution. Further, the claims suggest that the processing will relieve the institution of the administrative burden of performing the processing itself.  35:42-43; 36:55-56; 38:7-9; 38:60-61.  The specification states that the invention "allows the information submitted by the applicant to be transmitted to each institution in

12 - OPINION & ORDER

1   any data format that the institution requests so the institution is

2   not required to convert the data to a useable format." 8:22-26.

3       Given the claim language and the specification, the claim

4   phrase at issue is interpreted to mean that the user information

5   provided to the institution by the third party forms servicer is

6   available in an unlimited number of formats and is processed wholly

7   by the third party forms servicer and not the institution. The

8   claims of the '042 patent describe a function of limitless formats

9   with the formatting done by the third party forms servicer and

10  requiring no additional formatting or "mapping" by the institution.

11  Even overlooking the problems with the submissions of defendant's

12  documentary evidence, it appears that the XAP Online System in

13  operation before the critical date provided the user information in

14  a limited number of formats with additional formatting required by

15  the institution. As a result, the XAP Online System did not

16  completely anticipate the patent claims describing this function

17  before the critical date.

18                  ii. Electronic Payment

19      The '042 patent claims the following functions:

20      receiving by the third party forms servicer over the
        computer network user information and electronic payment
21      information entered by the user;

22      processing by the third party forms servicer an
        electronic payment associated with the form, the
23      processed payment being from the user to the one of the
        multiple institutions to which the form is directed[.]
24
    35:26-32; see also 36:42-48; 37:60-67; 38:54-56.
25
26      Defendant contends that the XAP Online System provided to CSU

    under the August 1996 Agreement, allowed the receipt by XAP of user
27
    and payment information entered by the user applicant and that
28

13 - OPINION & ORDER

procedures for payment by check or for the waiver of the application fee, were in use before the critical date. Plaintiff does not dispute this assertion.

Firstenberg admits that electronic payment processing by credit card did not become part of XAP's Online System with CSU until November 1, 1997, after the critical date. Exh. 3 to Apr. 21, 2003 Bricken Affid. (Firstenberg Depo.) at p. 7. But, defendant argues that the XAP system still invalidates plaintiff's '042 patent under the on-sale bar of section 102 because the promise to provide the electronic payment feature was contained in the August 1996 Agreement between CSU and XAP, and the procedure for credit card payments using CyberCash, one of several commercial credit card payment package vendors, was part of the overall architecture described in the February 20, 1997 "Requirements Specification" document related to the August 1996 Agreement.

The only evidence in the record directly supportive of defendant's contention that a promise to provide an electronic payment feature was contained in the August 1996 Agreement between XAP and CSU is Tansey's statement that the "credit card payment feature was part of the contract signed in August 29, 1996, and was part of the Requirements Specification." Tansey Apr. 18, 2003 Affid. at ¶ 9(iii). Additionally, James Maraviglia, a CSU employee who was part of the CSU team that awarded XAP the contract in August 1996, states that electronic payment by credit card was part of the August 1996 contract requirements. June 9, 2003 Maraviglia Affid. at ¶ 15.

Other evidence cited by defendant does not support the proposition. E.g. Exh. 2 to Apr. 21, 2003 Bricken Affid. at p. 2

14 - OPINION & ORDER

(a page of undated written presentation material by XAP and a company called SalePoint, Inc., regarding the implementation of an electronic data exchange cashiering system at CSU; handwritten date on previous page is "7/97," after the critical date); Exh. 3 to Apr. 21, 2003 Bricken Affid. (Firstenberg Depo.) at pp. 29, 32 (contains no reference to the contractual requirements for electronic payment).

Given the lack of argument on this point by plaintiff, I assume for the purposes of this motion that Tansey's and Maraviglia's statements are sufficient to establish the fact that the August 1996 Agreement between CSU and XAP contained a promise to provide an electronic payment feature.

Much of defendant's evidence in support of its contention that the procedures for implementation of CyberCash were contained in the February 1997 Requirements Specification is indirect or not supportive of the contention. _E.g._, Exh. 2 to Apr. 21, 2003 Bricken Affid. at p. 71 (May 1997 document showing the comparison of vendors providing internet credit card processing); _Id._ at pp. 73-73a (May 20, 1997 email from the "Co-Directors" of the CSU Mentor Program regarding a project update for the electronic payment feature of the online application system and noting that the "project team" had recently decided, after comparing various vendor options, "to go with CyberCash" after CyberCash had presented a revised, streamlined process; further noting that "XAP is currently proceeding with accommodating this product for Nov. 1, 1997 full production"; additionally noting that installation and testing of the CyberCash program would occur during June 1997 for full implementation by fall 1997); _Id._ at pp. 5-8 (March 5, 1997

15 - OPINION & ORDER

memorandum from Firstenberg following a February 1997 "CSUMentor Fee Payment Meeting" in which he outlines the meeting's discussion regarding the reconciliation report related to application processing fees); Id. at p. 34 (unidentified, undated document, but presumably from the February 1997 Requirements Specification, listing the overall requirements of the program and stating that the program will "[e]nable students to apply electronically to one or more campuses and pay for the application processing fee electronically."); Exh. 3 to Apr. 21, 2003 Bricken Affid. (Firstenberg Depo.) at p. 32 (stating that credit card payment vendors had been operating for several years for purposes other than admissions applications); Tansey Apr. 18, 2003 Affid. at ¶ 9(iii) and (iv) (stating that online credit payments systems were not new in 1996 and that incorporating a credit card payment feature into the XAP Online System was of extremely low technical risk).

Other evidence cited by plaintiff shows that the February 1997 Requirements Specification suggested that the electronic payment method was still undeveloped at that time. Exh. 3 to May 5, 2003 Cleveland Declr. at pp. AY 6502 (referring to credit card payments being "available by system deployment" in contrast to payment by check or fee waiver which were both available on November 1, 1996); AY 6503 (noting that the banking and reconciliation tasks associated with electronic credit card payment were "to be determined"); AY 6507 (noting that the process for sending credit card information to CyberCash was still "to be determined") AY 6509 (noting that "[c]redit card payment will be handled through the use of CyberCash, using a process to be determined and specified at a

16 - OPINION & ORDER

1  later date.").

2      Contrary to defendant's suggestion, the record does not

3  establish by clear and convincing evidence that the procedures for

4  implementing CyberCash were contained in the February 1997

5  Requirements Specification. Rather, the February 1997 Requirements

6  Specification noted that the program would allow electronic fee

7  payment and indicated that the process would be determined at a

8  later date.   The evidence indicates that separate from the

9  Requirements Specification, procedures were being written for a

10  reconciliation report and that during the period of March to May of

11  1997, XAP and CSU were evaluating proposals from different

12  electronic payment processing vendors and eventually selected

13  CyberCash.   The evidence further indicates that testing was

14  initially to occur in June 1997 and that at least Tansey thought

15  the implementation of CyberCash was of a low technical risk.

16  Maraviglia states that custom development was not required because

17  there were many commercial vendors offering an electronic credit

18  card payment service.  June 9, 2003 Maraviglia Affid. at ¶ 15.

19      Other evidence in the record shows that as of September 18,

20  1997, the live testing of the electronic payment feature was not on

21  schedule.  Exh. 1 to May 5, 2003 Cleveland Declr. at pp. XAP 7C,

22  7E. Additionally, in a March 27, 1998 Amendment to the August 1996

23  Agreement between CSU and XAP, XAP agreed to provide support

24  necessary to electronically link thirteen campus fee processing

25  programs with two cashiering vendors for the benefit of the campus

26  business office.  Exh. 2 to May 5, 2003 Cleveland Affid. at p. CNA

27  7671.  Without the enhancement, the campus business offices were

28  required to manually enter the application fee into their financial

17 - OPINION & ORDER

1   system.  Id.  XAP also agreed to create daily files for each campus

2   for students who paid via credit card.  Id.  This was in response

3   to the fact that the original contract did not anticipate costs

4   associated with campus requirements for processing credit card

5   payments for application fees which surfaced as the credit card

6   payment system was developed.  Id.

7       Based on all of the evidence in the record, plaintiff contends

8   that there is a material issue of fact as to whether the XAP Online

9   System fully anticipated the claims of the '042 patent when the

10  electronic payment feature was not operational until after the

11  critical date.  I agree with plaintiff.

12      Defendant relies on a 1986 case to argue that the date of a

13  purchase agreement or contract is the effective date upon which an

14  invention becomes part of the public domain and it is immaterial

15  that the delivery of the device or service embodying the invention

16  comes later.  J.A. LaPorte, Inc. v. Norfolk Dredging Co., 787 F.2d

17  1577, 1583 (Fed. Cir. 1986).  Based on this case, defendant argues

18  that because the August 1996 Agreement promises an electronic

19  payment feature and because the specifications for the feature were

20  determined before the critical date, the fact that the feature was

21  actually implemented until November 1997 is immaterial.

22      In LaPorte, the plaintiff LaPorte purchased a cutter

23  extension, used in dredging, from another business in November

24  1980.  The agreement was for the construction of the cutter

25  extension.  It is unclear from the opinion when the extension was

26  actually manufactured and delivered to LaPorte.  Later, in December

27  1981, the inventor, who had no direct relation to LaPorte, but who

28  had been a customer of the seller business, filed a patent

application for the cutter extension.  The defendant in the case subsequently ordered its own cutter extension from an entirely separate person, who had formerly been employed with LaPorte.

The defendant argued that the patent was invalid under section 102.  LaPorte argued that a sale by a third party that did not make a disclosure to the relevant "public" was not an on-sale bar.  In other words, a "secret commercialization" by a third party should not invalidate a patent.  In support, LaPorte relied on a case that had held that an inventor was not barred from patenting a process simply because of another's sale of products made by that same process.  Id. at 1582 (citing W.L. Gore & Assocs. v. Garlock, 721 F.2d 1540 (Fed. Cir. 1983)).

The court rejected LaPorte's argument and its reliance on Gore.  In discussing Gore, the court in LaPorte noted that

> [f]irst, unlike Gore, the invention here was discoverable from the device which was sold.  If LaPorte is arguing that, for purposes of the statutory bar, the sale should be deemed to have occurred no earlier than the delivery date of the device (which is after the critical date), that argument is contrary to our precedent and is again rejected.  To hold otherwise would mean adding a requirement that goods be "on hand" and transferred at the time of the sale to invoke the bar, a requirement specifically rejected by this court. . . . The date of the purchase agreement is, therefore, the effective date on which the invention became part of the public domain.  That delivery of the device embodying the invention occurred later is immaterial.

Id. at 1582-83 (citation omitted).

LaPorte is distinguishable.  There, while the date of the purchase agreement controlled for purposes of the on-sale bar analysis, there was no dispute that the purchased product, while still needing to be manufactured and delivered, completely embodied the patented invention.  Here, the entire first year of the August

19 - OPINION & ORDER

1  1996 Agreement between CSU and XAP was a developmental phase and

2  the Agreement was for the development of a system first, and then

3  the operation of it.  The documents demonstrate that testing of the

4  electronic payment feature had to occur before its implementation

5  and that this testing did not occur until after the critical date.

6  Unlike in LaPorte, this is not a pre-critical date promise to

7  deliver an already developed product embodying the invention, after

8  the critical date.  Rather, this is a pre-critical date promise to

9  develop a feature, test it, and make it operational by November 1,

10  1997, after the critical date.  LaPorte does not fit the facts of

11  this case.

12      As noted in a 1993 case, an on-sale bar finding requires that

13  the claimed invention, or here, XAP's Online System, that is

14  asserted to be on sale, must have been operable.  Keystone

15  Retaining Wall Sys., Inc. v. Westrock, Inc., 997 F.2d 1444, 1451

16  (Fed. Cir. 1997).  Although a commercially available electronic

17  payment product may have been readily available from a vendor like

18  CyberCash, its integration into the XAP Online System was still in

19  development.  While Tansey suggests that the integration was of low

20  technical risk, the evidence shows that XAP did not, and perhaps

21  could not have completed development, testing, and operation before

22  the critical date.

23      Because the record indicates that the feature may not have

24  been capable of, nor fully developed as part of this particular

25  system until after the critical date, defendant fails to show, by

26  clear and convincing evidence, the absence of material fact as to

27  whether the XAP Online System at CSU fully anticipated the claims

28  of the '042 patent before the critical date.  As a result,

20 - OPINION & ORDER

defendant's motion for summary judgment on the invalidity of the '042 patent based on its section 102 argument, is denied.

### iii.   Other Features

Plaintiff contends that two other features claimed in the '042 patent are also not fully anticipated by the XAP Online System. Plaintiff first points to the feature of automatically populating information on a subsequent application with information from a first application.   Plaintiff also cites to the feature of customizing each application form for the individual institution. Because I have already determined that there are issues of fact as to whether the XAP Online System fully anticipated at least two claimed functions of the '042 patent, I need not analyze plaintiff's additional arguments.

### 2.  Pfaff Analysis

As indicated above, the section 102 analysis, as articulated in Pfaff, requires defendant to show, by clear and convincing evidence, that the claimed invention was the subject of a commercial offer for sale and was ready for patenting, before the critical date.  Plaintiff raises several arguments in support of its position that there was no commercial offer for sale and that the invention was not ready for patenting, including that the August 1996 Agreement between XAP and CSU was for services and was not a sale under section 102, that the August 1996 Agreement between XAP and CSU was a license agreement and was not a sale under section 102, that the August 1996 Agreement, at least as to the electronic payment feature, was for an experimental purpose and was not a sale under section 102, and that several features, notably the electronic payment feature, were not ready for

21 - OPINION & ORDER

1   patenting because they had not been reduced to practice.

2       At first blush, it appears that some of plaintiff's arguments
3   may carry some weight, particularly those related to the electronic
4   payment feature and its experimental use and whether it was ready
5   for patenting.  But, as also indicated above, because there can be
6   no on-sale bar if the product sold did not fully anticipate the
7   claimed invention in the first place, and because I have already
8   denied defendant's summary judgment motion on that basis, I need
9   not resolve these additional arguments at this juncture.

10      C.  Section 112

11      In addition to its invalidity argument based on section 102's
12  on-sale bar, defendant also argues that claims 1-37 of the '042
13  patent are invalid under 35 U.S.C. § 112.  In particular, defendant
14  relies on paragraph 2 of section 112 which states that "[t]he
15  specification shall conclude with one or more claims particularly
16  pointing out and distinctly claiming the subject matter which the
17  applicant regards as his invention."  35 U.S.C. § 112, ¶ 2.

18      "Distinctly" means that the claims must have a clear and
19  definite meaning when construed in light of the specification.
20  Miles Labs., Inc. v. Shandon, Inc., 997 F.2d 870, 874-75 (Fed. Cir.
21  1993).  The requirement for "distinctness" or "definiteness" guards
22  against unreasonable advantages to the patentee and disadvantages
23  to others arising from uncertainty as to their respective rights.
24  Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573,
25  1581 (Fed. Cir. 1996).

26      The matter of claim adequacy or "definiteness" is a question
27  of law.  North Am. Vaccine, Inc. v. American Cyanamid Co., 7 F.3d
28  1571, 1579 (Fed. Cir. 1993).  Whether the claims meet the statutory

22 - OPINION & ORDER

requirements of section 112, paragraph 2 is a matter of claim construction. S3, Inc. v. nVIDIA Corp., 259 F.3d 1364, 1367 (Fed. Cir. 2001). As with the arguments made by defendant in support of its section 102 on-sale bar invalidity argument, because the claims of a patent are afforded a statutory presumption of validity, overcoming the presumption of validity requires that any facts supporting a holding of invalidity must be proved by clear and convincing evidence. Budde v. Harley Davidson, Inc., 250 F.3d 1369, 1376 (Fed. Cir. 2001) (stating so in the context of a section 112 invalidity argument); see also S3, 259 F.3d at 1367 (noting that the "claims as granted are accompanied by a presumption of validity based on compliance with, inter alia, § 112 ¶ 2.").

"The requirement that the claims 'particularly point[ ] out and distinctly claim[ ]' the invention is met when a person experienced in the field of the invention would understand the scope of the subject matter that is patented when the claim is read in conjunction with the rest of the specification." Id. "If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more." Miles Labs, 997 F.2d at 875.

When an indefiniteness argument is made as to a patentee with an issued patent, "close questions of indefiniteness in litigation involving issued patents are properly resolved in favor of the patentee[.]" Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1380 (Fed. Cir. 2001). As further explained in that case:

> In determining whether [the section 112, ¶ 2] standard is met, i.e., whether "the claims at issue [are] sufficiently precise to permit a potential competitor to determine whether or not he is infringing," Morton Int'l, Inc. v. Cardinal Chem. Co., 5 F.3d 1464, 1470, 37 USPQ2d

23 - OPINION & ORDER

1609, 1617 (Fed. Cir. 1993), we have not held that a claim is indefinite merely because it poses a difficult issue of claim construction. We engage in claim construction every day, and cases frequently present close questions of claim construction on which expert witnesses, trial courts, and even the judges of this court may disagree. Under a broad concept of indefiniteness, all but the clearest claim construction issues could be regarded as giving rise to invalidating indefiniteness in the claims at issue. But we have not adopted that approach to the law of indefiniteness. We have not insisted that claims be plain on their face in order to avoid condemnation for indefiniteness; rather, what we have asked is that the claims be amenable to construction, however difficult that task may be. If a claim is insolubly ambiguous, and no narrowing construction can properly be adopted, we have held the claim indefinite. If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds. See, e.g., Modine Mfg. Co. v. U.S. Int'l Trade Comm'n, 75 F.3d 1545, 1557, 37 USPQ2d 1609, 1617 (Fed. Cir. 1996) (rejecting indefiniteness argument after construing claims; stating that "when claims are amenable to more than one construction, they should when reasonably possible be interpreted to preserve their validity"); Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1581, 37 USPQ2d 1365, 1372 (Fed. Cir. 1996) (court chose the narrower of two equally plausible claim constructions in order to avoid invalidating the claim). By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of patent validity, see N. Am. Vaccine, Inc. v. Am. Cyanamid Co., 7 F.3d 1571, 1579, 28 USPQ2d 1333, 1339 (Fed. Cir. 1993), and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal.

Id. at 1375.

       1.    Claim Language At Issue and Parties'
                Proposed Constructions to Date

Defendant challenges the following claim limitation which appears in claims 1, 16, and 32: "processing by the third party forms servicer an electronic payment associated with the form[.]" 35:29-30; 36:45-46; 37:63-64. Defendant contends that this claim limitation is ambiguous, vague, and indefinite.

24 - OPINION & ORDER

1    The parties filed a Joint Claims Construction Statement
2  regarding the claims in the '042 patent ("'042 JCCS"), on February
3  10, 2003.  There, the parties construed the phrase "processing by
4  the third party forms servicer an electronic payment associated
5  with the form, the processed payment being from the user to the one
6  of the multiple institutions to which the form is directed[.]" '042
7  JCCS at p. 5.  The parties agreed that the word "form" meant "[a]
8  structured document having a collection of fields for entering and
9  containing data.  The form may be rendered to a user on a client
10 computer or any web-browser enabled graphical display." Id. at p.
11 3.

12    Although the parties initially disagreed as to the
13 construction of the term "electronic payment," they later agreed on
14 the following construction:  "an electronic transfer of funds, such
15 as an electronic check, credit card or debit card payment.
16 Electronic Payment does not include a fee waiver." Pltf's Feb. 21,
17 2003 Claim Constr. Brief at p. 2; see also Bricken Feb. 24, 2003
18 Letter (noting that the parties recently resolved the dispute over
19 the term "electronic payment").

20    For the first part of the disputed language ("processing by
21 the third party forms servicer an electronic payment associated
22 with the form"), the parties jointly offered the following
23 construction:   "Using the received payment information to
24 facilitate the clearance, settlement and/or transfer of the
25 electronic payment." '042 JCCS at p. 5.

26    Following the submission of the '042 JCCS, defendant told
27 plaintiff that, contrary to the position it took in the '042 JCCS,
28 it now disputed the meaning of "third party forms servicer" in the

25 - OPINION & ORDER

"processing" phrase quoted above.  Defendant argued that it should be allowed to dispute the construction of "third party forms servicer" and should not be limited to the '042 JCCS.  It contended that the scope of "third party forms servicer" was vague and susceptible to different meanings.  On February 21, 2003, defendant forwarded its proposed construction of "third party forms servicer" to plaintiff.

The construction offered by defendant at that time was as follows:  "The third party forms servicer uses the received payment information to facilitate the clearance, settlement and/or transfer of the electronic payment.  Third party forms servicer does not include the institution itself, nor an outsourced organization that performs the clearance, settlement and/or transfer of the electronic payment."  Bricken Feb. 24, 2003 Letter at p. 2.

Following that construction, defendant proposed yet another construction in a February 28, 2003 Memorandum filed with the Court.  There, defendant offered this construction:  "The third party forms servicer is the business entity hosting the forms engine software application used by the multiple institutions of higher education and multiple public forms users.  Third party forms servicer would not include the public forms user, any of the multiple institutions, nor another business entity."  Deft's Feb. 28, 2003 Claim Constr. Memo. at p. 3.

Plaintiff's initial proposed construction was limited to the joint construction of "form" and the "processing" phrase as contained in the '042 JCCS, as well as the subsequent filings showing the agreed-upon construction of "electronic payment."  In plaintiff's motion for summary judgment of literal infringement,

26 - OPINION & ORDER

1  plaintiff offers a four-part construction of the disputed claim
2  language.

3          2.  Discussion

4      Defendant contends that the disputed phrase is impermissibly
5  vague and indefinite because "processing" by a "third party forms
6  servicer" can be interpreted to mean "full service" or
7  "conventional" processing, as when the third party forms servicer
8  itself actually performs the verification and authorization
9  functions, or, it can be "hands off" or "proprietary" processing
10 where the third party forms servicer actually uses a fourth party
11 dedicated payment processor to do the "processing." Defendant also
12 contends that there is an array of "processing" services that could
13 be performed in between the "full service" and "hands off"
14 approaches.

15     Defendant argues that one of ordinary skill in the art has no
16 basis for judging what "processing" actions, and by what entities,
17 are encompassed by the patent language. As such, defendant argues,
18 competitors in the marketplace are left at the mercy of the
19 patentee when seeking to design around the patent claims.

20     I disagree. As indicated above, all that is required to pass
21 muster under section 112, paragraph 2, is that the "claims be
22 amenable to construction, however difficult that task may be."
23 Exxon Research, 265 F.3d at 1375. The meaning of the claim "may be
24 one over which reasonable persons will disagree[,]" but may still
25 be valid under section 112, paragraph 2. Id. As recently
26 explained by the Federal Circuit, "[t]he standard of indefiniteness
27 is somewhat high; a claim is not indefinite merely because its
28 scope is not ascertainable from the face of the claims. . . .

27 - OPINION & ORDER

Rather, a claim is indefinite under § 112 ¶ 2 if it is 'insolubly ambiguous, and no narrowing construction can properly be adopted.'" Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1342 (Fed. Cir. 2003) (quoting Exxon Research, 265 F.3d at 1375) (other citation omitted).

Here, defendant itself has offered three plausible constructions of the disputed phrase. Whether these are the constructions the court would adopt is not the point in a section 112, paragraph 2 analysis. As long as the claims are susceptible to a reasonable construction that would inform potential infringers of the bounds of the claim, there is no section 112, paragraph 2 violation. Defendant's own proposed constructions demonstrate that the disputed claim phrase is not impermissibly vague and indefinite. I deny defendant's motion for summary judgment on the invalidity of the '042 patent based on its section 112, paragraph 2 argument.

II.  Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment of literal infringement of claims 1, 9, 10, and 21 of the '278 patent and claims 1, 6, 10, 11, 16, and 32 of the '042 patent. For the claims of the '042 patent, plaintiff further limits the motion to those instances of infringement where the customer opts to use defendant's "e-Payment Processing" services.

A.  Infringement Standards

"An infringement analysis involves two steps in which the court first determines the correct claim scope, and then compares the properly construed claim to the accused method or device to determine whether all of the claim limitations are present either

28 - OPINION & ORDER

literally or by a substantial equivalent." RF Delaware, Inc. v. Pacific Keystone Techs., Inc., 326 F.3d 1255, 1266 (Fed. Cir. 2003).   "Although claim construction is a question of law, infringement, either literal or under the doctrine of equivalents, is a question of fact." Id.   Although a question of fact, infringement may prove amenable to summary judgment when the nature, operation, or structure of the accused device is not in dispute. Laitram Corp. v. Morehouse Indus., Inc., 143 F.3d 1456, 1461 (Fed. Cir. 1998); Phonometrics, Inc. v. Northern Telecom, Inc., 133 F.3d 1459, 1463-64 (Fed. Cir. 1998).   Plaintiff must prove infringement by a preponderance of the evidence.   Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 261 F.3d 1329, 1336 (Fed. Cir. 2001).

To succeed on a literal infringement claim, plaintiff must show that each and every element of the asserted claim is found in the accused system or method.   Tate Access Floors, Inc. v. Interface Architectural Res., Inc., 279 F.3d 1357, 1366 (Fed. Cir. 2002) ("Literal infringement exists if each of the limitations of the asserted claim(s) read on, that is, are found in, the accused device."). Use of additional structures or limitations beyond the limitations set forth in the patent claim does not preclude infringement. Stiftung v. Renishaw PLC, 945 F.2d 1173, 1178 (Fed. Cir. 1991) ("It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device.").

B.  Infringement of the '278 Patent

Defendant has two products on the market – a "Flagship" system and one called the "i-Class" system.  Plaintiff contends that both

29 - OPINION & ORDER

systems infringe plaintiff's patents.

Exhibit F to the expert report of plaintiff's expert Leonard Shapiro (which is, in turn, Exhibit 3 to the April 21, 2003 Cleveland Declaration), is an analysis of claims 1, 9, 10, and 21 of the '278 patent.  The exhibit is a chart which breaks down each patent claim by element or function and then compares that element or function to a comparable function performed by defendant's two systems.  The chart contains citations to evidence in the record demonstrating the functions performed by defendant's systems.

With the exception of the specific elements or functions discussed below, I conclude that Exhibit F, and the evidence cited therein, supports plaintiff's motion for the literal infringement of the '278 patent by defendant's two systems.

1.  Claims 1, 9, and 10

Defendant challenges plaintiff's evidence regarding the literal infringement of claims 1, 9, and 10 of the '278 patent. Defendant initially made two arguments in support of its position that neither of its systems infringe these claims:  first, that its systems do not practice a particular limitation related to "the data storage," and second, that the "the data storage" limitation is vague and indefinite in any event.  During the briefing of the motions, defendant raised an additional argument regarding the failure of its systems' practice of another limitation regarding the "customized form."

a.  Absence of a Limitation - Data Storage

Claim 1 provides, in pertinent part:

storing the posted applicant information <u>in a database</u> having . . .

30 - OPINION & ORDER

1     . . .

2     automatically inserting into some of the second form data
    fields applicant information <u>from the database</u>;
3

    . . .
4

5     entering applicant information into the second form data
    fields into which information was not inserted from the
    <u>data storage</u> or into which the data inserted from the
6     <u>data storage</u> is to be changed[.]

7 Exh. A to Compl. in CV-02-484-HU (22:48-67-23:1-2) (emphasis

8 added).[3] Claim 1 is the independent claim, but claims 9 and 10 are

9 dependent claims that would not be infringed if claim 1 is not

10 infringed. Thus, the analysis focuses on claim 1.

11     Defendant argues that because claim 1 recites both a

12 "database" and a "data storage," the implication is that a "data

13 storage" is something different from a database and, because

14 defendant's systems store information in a database only and do not

15 store applicant information in a data storage location separate

16 from the database, there can be no literal infringement. Plaintiff

17 disputes this interpretation of "database" and "data storage." As

18 a result, I am required to construe terms which the parties

19 previously suggested needed no construction. <u>See</u> Nov. 15, 2002

20 Joint Claims Constr. Stmt re: '278 Patent at pp. 4-6. I previously

21 set out the standards used to interpret patent claims in the

22 December 20, 2002 Opinion on Claims Construction regarding the '278

23 patent. Dec. 28, 2003 Claims Constr. Op. at pp. 3-6. I

24 incorporate those standards by reference.

25     The claim language quoted above shows that the reference to

26

27     [3] As with the '042 patent, references to the '278 patent
will be to this Exhibit and will be denoted simply by the column
28 and line number referred to, such as 22:48-67.

1    "data storage" is preceded by "the," a definite article.  The use
2    of "the" rather than the indefinite article "a," indicates a
3    reliance on an antecedent basis for the meaning of "data storage."
4    See Warner Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1356 (Fed.
5    Cir. 2003) (noting that the definite article "the" preceding "use"
6    meant that "the use" referred to a specific "use" rather than a
7    previously undefined "use") (citing American Bus. Ass'n v. Slater,
8    231 F.3d 1, 4-5 (D. C. Cir. 2000) ("[I]t is a rule of law well
9    established that the definite article 'the' particularizes the
10   subject which it precedes.  It is a word of limitation as opposed
11   to the indefinite or generalizing force of 'a' or 'an.'" (citations
12   omitted))); see also Process Control Corp. v. HydReclaim Corp., 190
13   F.3d 1350, 1356-57 (Fed. Cir. 1999) (noting the importance of an
14   antecedent basis in claim construction).

15        "Data storage" generally refers to some type of storage of
16   data.  See Deft's Opp. Mem. at p. 5 ("'data storage' in Computer
17   Science is a very general term that can be used to indicate any
18   type of memory devise used to store data.").  Here, claim 1 refers
19   to "the data storage" from which applicant data is inserted.  The
20   plain meaning refers to whatever was previously claimed as the
21   storage for applicant data.  In claim 1, the applicant data is
22   previously claimed to be stored in "a database."  Thus, the clear
23   antecedent basis for "the data storage" is the "database"
24   previously referred to in the claim.

25        References in other claims show the relationship between data
26   storage and database and suggest that "the data storage" may
27   include a "database." 24:65-66 ("the second data storage including
28   a database having a database field structure defined by multiple

32 - OPINION & ORDER

database fields"); 25:58-60 ("The system of claim 21 in which the first or second data storage comprises one or more relational database tables stored on a computer readable medium.").

The specification also shows the relationship between "the data storage" and the database storing the applicant information. The preferred embodiment states that "[s]erver 16 is preferably operated by a third party application servicer 24 and is connected to secure data storage 26." 4:6-8, Fig. 1. "Data storage" is thus described as a place where data can be stored at the server computer. In Figure 5, the applicant information is shown to be stored in an applicant database. Fig. 5. That applicant database and the password database comprise "database 26." 4:64-5:2-6.

Defendant cites to part of the prosecution history in support of its argument. According to defendant, plaintiff submitted the following amendment to distinguish the '278 patent from the prior art reference of Scharmer:

> As described above, Scharmer does not store user information in a database and cannot make entered information available for use on subsequent forms. Applicants can create new forms and can add new data to the database without having to reprogram existing forms. Because Scharmer's forms are merely text (or graphics) with blanks in them, and information is identified only by its coordinates on the display screen, any changes to the location of the data on the database report or the form necessitates a change to the program associated with the smart key.

Exh. 7 to May 5, 2003 Bricken Affid. at p. 1. Defendant contends that the amendment distinguished storing applicant information in a database and storing applicant information in a separate data terminal memory location in an attempt to overcome a rejection of the '278 patent for being unpatentable over Scharmer.

I disagree with defendant's interpretation of the quoted

33 - OPINION & ORDER

1  passage.  I do not read it as a suggestion that the invention of

2  the '278 patent used a database and a separate memory location in

3  which to store information.  Rather, the distinction is that

4  because the '278 invention stores information in a database,

5  information stored in the database is available for subsequent

6  forms and new data may be added without having to reprogram

7  existing forms.

8      Based on the plain language of the claims, the specification,

9  and the prosecution history (or lack thereof), I construe "the data

10 storage" in claim 1 to mean the database referenced earlier in the

11 claim in which the applicant information is stored.  Because the

12 interpretation is unambiguous based on the intrinsic evidence, it

13 is unnecessary to consider extrinsic evidence.  <u>Vitronics Corp. v.</u>

14 <u>Conceptronic, Inc.</u>, 90 F.3d 1576, 1584 (Fed. Cir. 1996).[4]

15     Other than the argument that "the data storage" is something

16 other than the previously claimed database, defendant presents no

17 argument to show that its two systems do not infringe this function

18 of the '278 patent.  The evidence shows that both the Flagship and

19 i-Class systems store applicant information in a database.  Exh. 4

20 to Apr. 21, 2003 Cleveland Declr. (Deft's Answers to Pltf's

21 Requests for Admiss.) at RFA 22, 23, 32, 33 (defendant admits that

22 in the Flagship and i-Class systems, applicant information is

23 stored in a database); Exh. 1 to May 19, 2003 Dettinger Declr.

24

25     [4] I note, however, that defendant's expert, Daniel Menasce,

26 admits that nothing in the amendment cited by defendant states
   that "the data storage" is not the database.  Exh. 1 to May 19,

27 2003 Dettinger Declr. (Menasce Depo.) at p. 70 (the amendment
   does not say that a database is not a type of data storage

28 because a database it a type of data storage).

34 - OPINION & ORDER

1  (Menasce Depo.) at pp. 70-71 (defendant uses a database to store

2  information).

3                    b.   Absence of a Limitation - Customized Form

4       Several of the asserted claims recite limitations concerning

5  customized forms, including the following:  (1)  "application form

6  customized  in  accordance  with  the  preferences  of  the  first

7  institution,"  '278 patent (claim 1), 22:38-40; (2) "[a] system for

8  creating   and   processing   customized   forms   for   unrelated

9  institutions,"  '278 patent (claim 21), 24:52-54; and (3) "forms

10 that are customized in appearance and content in accordance with

11 the preference of the institution to which each of the forms is

12 directed," '042 patent (claim 1), 35:14-17.[5]

13      Based on the testimony of James Wolfston, plaintiff's chief

14 executive officer, expert witness for plaintiff on damages, and one

15 of the '278 and '042 patents, defendant argues

16 that  "customized  form"  or  "customized  application"  must  be

17 interpreted to mean that the application form is "transparent" and

18 contains  no  references  or  other  indicia  that  the  application  is

19 being hosted by the forms service provider.  Defendant argues that

20 both  the  Flagship  and  i-Class  systems  do  not  infringe  the

21 "customized form" limitation when it is interpreted to include the

22 concept   of   transparency   because   both   systems   provide   for

23 defendant's vendor name and brand to be viewed in several places,

24 including the log-in sheet.

25 _____

26      [5]  The "customized form" limitation appears in several of
   the claims of both the '278 patent and the '042 patent.  Although
27 I first address it in claim 1 of the '278 patent, and thus do not
   address it again, this discussion of the limitation applies to
28 the other claims in either patent.

1    The relevant portion of Wolfston's deposition is attached as
2    Exhibit 1 to the June 12, 2003 Bricken Affidavit.  I reject
3    defendant's interpretation of Wolfston's testimony.  I do not read
4    Wolfston's statements as clearly stating that a customized form
5    must be one that makes no reference to the forms servicer business
6    entity.  Rather, he indicates that there are "various ways" to
7    "customiz[e] applications to a university" and "[o]ne is to
8    construct the application in a manner that contain[s] the data and
9    the questions that the institution asks for and further to
10   emphasize their brand."  Exh. 1 to June 12, 2003 Bricken Affid. at
11   p. 5.  He further notes that a vendor that ignored the requirements
12   of the institution for any kind of tailored presentation of the
13   application would not read on plaintiff's patents.  This testimony
14   does not suggest that the interpretation of "customized form" in
15   plaintiff's patents requires the forms to be "transparent" relative
16   to the forms servicer business entity.

17   Furthermore, as plaintiff notes, defendant, while describing
18   the operation of the accused systems in its memorandum, cites no
19   evidence demonstrating the operation of either the Flagship or the
20   i-Class system.  An unsupported assertion in a memorandum cannot
21   create an issue of fact.

22   The claim language appears plain on its face.  The language
23   indicates that "customized form" is a form made according to the
24   preferences of each particular institution.  Nothing in the claim
25   language suggests that the form must be "transparent" by concealing
26   any reference to the servicer.  Neither party cites any parts of
27   the written specification or the prosecution history relevant to
28   the construction arguments presented in connection with "customized

36 - OPINION & ORDER

form."

Additionally, defendant has already admitted that its systems practice this limitation. Exh. 4 to Apr. 21, 2003 Cleveland Declr. (Deft's Answers to Pltf's Requests for Admiss.) at RFA 44, 45, 52, 53, 64, 65 (admitting that the Flagship and i-Class systems allow the institution to customize an application form); see also Deft's Resp. to Pltf's Concise Stmt of Facts at ¶ 5(c) (accepting plaintiff's asserted fact that both of defendant's systems allow a school to customize an application form in content and appearance, including an indication of source such as a logo).

Because the reasonable interpretation is clear from the claim language and defendant fails to demonstrate through Wolfston's testimony that any other meaning is fairly ascribed to the claim, see Bell Atl. Network Servs., Inc. v. Covad Comm'ns Group, Inc., 262 F.3d 1258, 1268-69 (Fed. Cir. 2001) (improper to rely on extrinsic evidence, which includes inventor's testimony, if meaning is clear from intrinsic evidence alone), the proper construction of "customized form" contains no concept of transparency. As a result, defendant fails to create a material issue of fact regarding the accused systems' practice of the "customized form" limitation in either the '278 or the '042 patents.

c.  Vague and Indefinite

Defendant next argues that the limitation "inserted from the data storage" in claim 1 is vague and indefinite in violation of 35 U.S.C. § 112, ¶ 2. First, I note that invalidity, while a defense to liability, is not determinative of whether there has been infringement. See Pandrol USA, LP v. Airboss Ry. Prods., Inc., 320 F.3d 1354, 1365 (Fed. Cir. 2003) ("patent infringement and

37 - OPINION & ORDER

1  invalidity are separate and distinct issues[;] . . . [t]hough an
2  invalid claim cannot give rise to liability for infringement,
3  whether it is infringed is an entirely separate question capable of
4  determination without regard to its validity.") (internal quotation
5  omitted); <u>Tate Access Floors</u>, 279 F.3d at 1369 (the general
6  statement that "invalidity is a defense to an action for patent
7  infringement" "provides no license for asserting that a particular
8  defense, if successful, results in noninfringement as opposed to
9  invalidity."). Thus, because a meritorious invalidity argument
10 does not negate a finding of infringement, defendant's invalidity
11 argument is not properly considered at this juncture. Defendant
12 should have raised such an argument in its own motion.

13       Secondly, however, given the reasonable construction of this
14 phrase in the discussion above to mean that "the data storage"
15 relates to the database previously claimed and where applicant
16 information is stored, defendant's section 112, paragraph 2
17 argument is unavailing. The phrase is not impermissibly vague and
18 indefinite.

19            2.  Claim 21
20       Defendant makes only one argument regarding claim 21 of the
21 '278 patent:  that defendant's systems do not practice the claim
22 limitation of "form description information." I reject defendant's
23 argument.

24       Claim 21 is a system claim for creating and processing
25 multiple customized forms from unrelated institutions using a third
26 party data storage over a computer network. In pertinent part it
27 provides:

28       A system for creating and processing customized forms for
38 - OPINION & ORDER

unrelated institutions using a common third party data
storage over a computer network, the system including:

a server computer operated by the third party and in data
communication over a data network with a client computer
for requesting a form and for entering information onto
the form;

first data storage in communication with the server
computer and including <u>form description information
specifying the content and appearance of each customized
form</u>;

second data storage in communication with the server
computer and including user information posted from the
client computer, the second data storage including a
database having a database field structure defined by
multiple database fields, the database including multiple
records, each record capable of storing information
corresponding to each of the database fields; and

a forms engine program operating on the server computer
for generating a form from <u>the form description
information</u> in response to a request for the form
transmitted from the client computer over the computer
network . . .

24:52-67-25:1-7 (emphasis added).

As described in claim 21, the "form description information"
specifies the content and appearance of each customized form.
Defendant argues that the phrase is used as a pseudonym for the
term "application description file" or "application data file." As
such, defendant contends that neither of its systems infringe on
claim 21 of the '278 patent because the i-Class system does not
contain an "application information file" as that term was
previously construed in the December 20, 2002 Claims Construction
Opinion, and because the document relied on by plaintiff in support
of its position that the Flagship system infringes claim 21, lacks
information regarding a data storage location or a network
connection to a server computer.

Again, I start with the construction of the disputed phrase as

39 - OPINION & ORDER

the first part of the infringement analysis.  Notably, the plain language, as indicated above, suggests that "form description information" is the information directed to the design of the customized form.   Nothing in the claim indicates that "form description information" encompasses more than the descriptive information itself.

Defendant cites to several parts of the specification in support of its argument that "form description information" is equivalent to "application information file."  Defendant notes the following passages:

> Forms engine 104 then generates a customized application form based upon an application description in an application data file 108.

5:61-63.

> If the data pass first stage validation, the next application page is prepared by merging applicant information from the applicant database 62 with form information in application data file 108 and sending the resulting HTML application page to the applicant.

6:18-23.

> Forms engine 104 uses data from the appropriate application data file 108 (FIG. 14) and previously entered user data to generate a page of a form 128.

6:55-58.

> The application data file describes the format of each application, and the forms engine displays information from the database in the format prescribed by the application data file.

8:56-59.

> The forms engine automatically uses the application data file to produce the requested application in HTML format for display on the applicant's browser.  The application description file can be easily modified, for example, to change labels or to add additional fields.  The appearance of the application for each institution can be changed by changing its application description file, without reprogramming the forms engine.

40 - OPINION & ORDER

8:63-9:3.

> The Application Data File is a specially formatted text file that acts as an application description. . . . The information in the Application Data File could alternatively be included in the Applications Table. . . . In an alternative embodiment, rather than having the application information stored as directives and building the application whenever a student invokes it on-line, the application is built by a pre-processor utility that is run once to produce an "application template" with a regularized syntax.

10:41 to 11:4.

The cited passages clearly show a relationship between "form description information" and "application data file" or "application description file." For example, in the first three quoted passages, the application description is described as being located in an application data file, suggesting a distinction between the information and the file. The fourth and fifth quoted passages seem to refer to the application data file as possessing the information. The last quoted passage appears to make a distinction between the information and the data file.

While establishing a relationship between the "form description information" and "application data file," I disagree with defendant that the quoted passages clearly show that "form description information" is a pseudonym for "application information file." Rather, the specification preserves the distinction between the data/information itself, and the file that contains the data/information. To adopt defendant's construction would improperly read the "application information file" limitation from the specification into claim 21. Intel Corp. v. United States Int'l Trade Comm'n, 946 F.2d 821, 836 (Fed. Cir. 1991). Moreover, defendant has already stated that "application information file" is

41 - OPINION & ORDER

1  not found in claim 21.   Deft's Nov. 8, 2002 Claim Constr. Resp.

2  Memo. at p. 6 n.2.

3      Based on the claim language and the specification, I reject

4  defendant's argument that "form description information" is

5  equivalent to "application information file," "application data

6  file," or "application description file."   "Form description

7  information" refers solely to the information used to customize a

8  form and does not refer to the container, or file folder, if you

9  will, where such information resides.

10     Plaintiff's evidence demonstrates that defendant's systems

11  infringe this element of the '278 patent.  First, as to the i-Class

12  system, the evidence shows that i-Class stores form description

13  information in more than one file.  Exh. F to Exh. 3 to Apr. 21,

14  2003 Cleveland Declr. (Shapiro Report) at p. 9 (information

15  specifying the content of customized forms is stored in a client

16  specific directory); Exh. 6 to May 5, 2003 Bricken Declr. (Costa

17  Depo.) at p. 8 ("form may be composed of multiple files"); Exh. 1

18  to May 19, 2003 Dettinger Declr. (Menasce Depo.) at p. 89 (form

19  description information may be stored in more than one file).  I

20  further agree with plaintiff that defendant does not appear to

21  dispute the fact that the i-Class system has form description

22  information that specifies the content and appearance of the forms

23  (in one or more files), stored in a "data storage" and that is all

24  claim 21 requires.

25     As for infringement by the Flagship system, plaintiff's expert

26  states that the Flagship product "includes description information

27  specifying the content and appearance of a customized form."  Exh.

28  F. to Apr. 21, 2003 Cleveland Affid. (Shapiro Report) at p. 9.

42 - OPINION & ORDER

1   Defendant argues that the document cited in support of this
2   assertion, AY0422, merely discloses the benefits and advantages of
3   the "Form Builder" feature of the Flagship product without any
4   discussion of how or where the "description information" is stored.
5   Defendant argues that because AY0422 does not disclose any
6   information regarding a data storage location or a network
7   connection to a server computer for the Flagship system, the
8   Flagship system does not infringe claim 21 of the '278 patent which
9   provides that the system includes a "first data storage in
10  communication with the server computer and including form
11  description information specifying the content and appearance of
12  each customized form[.]"  24:59-62.

13      Shapiro does state that the Flagship system's web server is in
14  communication with the database storing the form description
15  information.  In support, he cites to page AY1869.  This is a flow
16  chart showing the electronic application database system of the
17  Flagship system.  Exh. 10 to Apr. 21, 2003 Cleveland Affid. at p.
18  AY1869.  It shows that the institution application forms reside in
19  an electronic-application configuration database.  Id.
20  Additionally, page AY1870 indicates that institution applications
21  are located on a "LAM e-app server." Id. at p. AY1870.

22      Thus, while one of the pages Shapiro cites, page AY0422, may
23  not be enough to show that the Flagship system practices the
24  function of storing information related to the customized
25  application forms, the other documents noted in the previous
26  paragraph establish that the Flagship system does indeed practice
27  the claimed limitation in claim 21.

28  / / /

43 - OPINION & ORDER

1    C.  Infringement of the '042 Patent

2    Exhibit G to the expert report of plaintiff's expert Leonard

3    Shapiro (which is, in turn, Exhibit 3 to the April 21, 2003

4    Cleveland Declaration), is an analysis of claims 1, 6, 10, 11, 16,

5    and 32 of the '042 patent.  The exhibit is a chart which breaks

6    down each patent claim by element or function and then compares

7    that element or function to a comparable function performed by

8    defendant's two systems.  The chart contains citations to evidence

9    in the record demonstrating the functions performed by defendant's

10   systems.

11   With the exception of the specific elements or functions

12   discussed below, I conclude that Exhibit G, and the evidence cited

13   therein, supports plaintiff's motion for the literal infringement

14   of the '042 patent by defendant's two systems.

15   Defendant makes three arguments in opposition to plaintiff's

16   motion as to the literal infringement of claims 1, 6, 10, 11, 16,

17   and 32 of the '042 patent:  (1) that defendant's systems do not

18   practice the electronic payment limitation; (2) that defendant's

19   Flagship system performs the custom data formatting claim

20   limitation in a substantially different way; and (3) alternatively,

21   that the claims are impermissibly vague and indefinite in violation

22   of section 112, paragraph 2.

23               1.  Construction  of the Phrase
                 "Processing by the Third Party Forms
24               Servicer  an  Electronic  Payment
                 Associated with the Form"
25

26   The phrase "processing by the third party forms servicer an

27   electronic payment associated with the form" is discussed above in

28   connection  with  defendant's  motion  for  summary  judgment  on

1  invalidity.   As noted there, the phrase appears in independent
2  claims 1, 16, and 32 of the '042 patent.   35:29-30; 36:45-46;
3  37:63-64.

4      Because the parties dispute the proper construction of the
5  phrase, I am required to perform a claims construction analysis as
6  the first step of assessing the merits of plaintiff's infringement
7  argument.   As indicated above, the parties have previously agreed
8  on the construction of certain components of the phrase such as
9  "form," "electronic payment," and "processing."   The jointly
10 proposed constructions are consistent with the claim language.   I
11 adopt those constructions of the terms "form, "electronic payment,"
12 and "processing."

13     In response to this motion, defendant reiterates its
14 invalidity argument based on section 112, paragraph 2.
15 Alternatively, defendant contends that the phrase runs afoul of 35
16 U.S.C. § 112, ¶ 1, which requires that the specification contain a
17 "written description of the invention, and of the manner and
18 process of making and using it, in such full, clear, concise, and
19 exact terms as to enable any person of skill in the art to which it
20 pertains . . . to make and use the same . . . ." 35 U.S.C. § 112,
21 ¶ 1.

22     As a second alternative, defendant argues that if the phrase
23 is amenable to construction, the proper construction is the one it
24 posited in its February 28, 2003 claim construction memorandum
25 which states that "[t]he third party forms servicer is the business
26 entity hosting the forms engine software application used by the
27 multiple institutions of higher education and multiple public forms
28 users.  Third party forms servicer would not include the public

1  forms user, any of the multiple institutions, nor another business

2  entity."  Deft's Feb. 28, 2003 Claim Constr. Memo. at p. 3.

3       In the context of this motion, plaintiff asserts a different

4  construction of the phrase.  Plaintiff contends that the following

5  four-part construction is appropriate:

6            1.  Using the received payment information to
             facilitate the clearance, settlement and/or transfer of
7            the electronic payment [this is the agreed-upon
             construction of "processing][;]
8            2.  The third party forms servicer performs this
             step electronically (without manual steps), possibly
9            acting through its agent(s)[;]
             3.  This step allows, but does not require, others
10           to participate in the processing of the electronic
             payment[; and]
11           4.  This step relieves the institution of the
             responsibility for clearance or settlement of the
12           electronic payment.

13  Pltf's Mem. in Support of Pltf's Motion at pp. 6-7.

14       I do not consider defendant's invalidity arguments in the

15  context of this motion.  I have already addressed defendant's

16  section 112, paragraph 2 argument in the context of defendant's

17  motion for summary judgment where it was properly raised.  Although

18  I have not previously addressed defendant's section 112, paragraph

19  1 argument, I do not do so here because as discussed above,

20  invalidity, while a defense to liability, is not determinative of

21  whether there has been infringement.  Because defendant did not

22  raise a section 112, paragraph 1 defense in its own invalidity

23  motion, I do not consider it.

24                 a.  Claim Language

25       The relevant words of the claim are "processing by the third

26  party forms servicer an electronic payment associated with the

27  form."  The language appears, as noted above, in claims 1, 16, and

28  32.  In addition, while claim 38 does not use the identical

46 - OPINION & ORDER

language, it does contain a similar limitation by providing for a method which includes "receiving from the form user via the third party form servicer an electronic payment associated with the customized form[.]"  38:54-56.

The term "third party forms servicer" is used throughout the claims.  It first appears in claim 1:

> A method of processing over a computer network forms directed by multiple public forms users to multiple institutions of higher education, the forms being processed by a third party forms servicer that is neither one of the institutions of higher education nor one of the public forms users, the method comprising:"

35:2-7.  This same language appears in the introductory paragraph to claim 16.  36:35-37.  Claims 32 and 38 also contain near-identical introductory language.  37:48-50; 38:40-42.

In interpreting claims, "the same word appearing in the same claim should be interpreted consistently."  <u>Digital Biometrics, Inc. v. Identix, Inc.</u>, 149 F.3d 1335, 1345 (Fed. Cir. 1998).  Based on the language of the claims, "third party forms servicer" must initially be construed as excluding any public form user and any of the institutions of higher education.

The parties' dispute centers on whether once the form user and the institution are eliminated as "third party forms servicers," the "processing" function is to be performed exclusively by the business entity hosting the forms engine software application or whether performance of that function may be shared by the business entity and an additional fourth party.  Defendant contends that "third party forms servicer" should be limited to the forms engine host business entity because claim language immediately preceding and following the disputed phrase requires that the third party

47 - OPINION & ORDER

1  forms servicer "receive" user and payment information and "process"
2  the user and payment information.  Defendant contends that since
3  the business entity hosting the forms engine is the third party
4  forms servicer used to process the user information, it must be
5  that same entity that processes the payment information.

6      However, plaintiff notes that these are "comprising" claims
7  which recite required steps and elements, but which do not preclude
8  additional steps or elements.  Vehicular Techs. Corp. v. Titan
9  Wheel Int'l, Inc., 212 F.3d 1377, 1382-83 (Fed. Cir. 2000) ("The
10 phrase 'consisting of' is a term of art in patent law signifying
11 restriction and exclusion while, in contrast, the term 'comprising'
12 indicates an open-ended construction. . . . In simple terms a
13 drafter uses the phrase 'consisting of' to mean 'I claim what
14 follows and nothing else.'  A drafter uses the term 'comprising' to
15 mean 'I claim at least what follows and potentially more.'")
16 (citations omitted); Georgia-Pacific Corp. v. United States Gypsum
17 Co., 195 F.3d 1322, 1327-28 (Fed. Cir. 1999) (use of the word
18 "comprising" means including the elements that follow, but not
19 excluding additional, recited elements).

20     Plaintiff argues that because these are "comprising" claims,
21 nothing in the claim language precludes another party from taking
22 part in the processing of electronic payments.  Plaintiff contends
23 that as "comprising" claims, the claims merely require that the
24 third party forms servicer include the business entity hosting the
25 forms engine as a party involved in the processing of payments, but
26 not the sole party performing that function.

27     I agree with plaintiff.  Although the claim language noted by
28 defendant requires the "third party forms servicer" to "receive"

48 - OPINION & ORDER

1  both user and payment information and then to "process" both user
2  and payment information, it does not, by itself, limit the
3  interpretation of "third party forms servicer" to the forms engine
4  host business entity nor does it preclude that entity from
5  utilizing a fourth party to participate in the "processing."  I
6  note that the parties themselves define "processing" to include
7  "facilitation" of the electronic payment.  This suggests that the
8  role of the "third party forms servicer" is not restricted to the
9  actual performance of the processing function, but may include a
10 facilitator capacity.

11      Given the nature of a "comprising" claim, additional elements
12 may be part of the claim.  Accordingly, based on the claim
13 language, I interpret the disputed phrase "processing by the third
14 party forms servicer," to mean that the processing function, as
15 previously construed by the parties, includes, but is not limited
16 to, processing by the business entity hosting the forms engine
17 software and excludes any processing by any public form user or any
18 of the institutions of higher education.

19                    b.  Specification

20      Plaintiff contends that the processing of the payment
21 function is done electronically and not manually.  Several
22 references in the specification support plaintiff's contention
23 because of the use of the word "electronically" with "process."
24 1:28-29 ("allows an institution to process the application
25 information electronically"); 2:14-16 ("[a]ny fees associated with
26 the forms can be processed electronically over a computer network
27 together with the forms"); 4:14-24 (". . . also allows the
28 application fee to be processed on-line so that credit card

49 - OPINION & ORDER

settlements, electronic bank withdrawals, and other payment methods can be performed more efficiently"); 4:51-55 (". . . application is preferably hosted by a third party to ease data sharing across institutions and electronic processing of application fees.").

As to the construction of "third party forms servicer," plaintiff cites to the following parts of the specification:

(1) "If the second stage validation is successful, user data 120 is written to the applicant database 62 and payment scripts 122 are executed in which the user is given an option to select any one of several of on-line payment methods.  Credit card information is verified from a credit card database 124."  6:28-32.

> (2)    On-line    application    also    allows    the application fee to be processed on-line, so that credit card settlements, electronic bank withdrawals, and other payment methods can be performed more efficiently, and the settlement can be easily facilitated by the third party that operates the application forms engine to which multiple institutions subscribe.

4:19-24.

With these references, the specification supports plaintiff's construction that the "third party forms servicer" is not limited to the business entity hosting the forms engine software.  By referring to a separate "credit card database," the specification suggests that a fourth party is involved in the electronic payment processing.  Similarly, the specification language identifies the role  of  the  business  entity  hosting  the  forms  engine  as "facilitating" the settlement of the electronic payment, a strong indication that that business entity is not exclusively performing all processing functions.

Defendant, however, relies on other parts of the specification

50 - OPINION & ORDER

in support of its position that "third party forms servicer" is limited to the business entity hosting the forms engine. These references either refer to a "third party" as the entity operating the forms engine or least imply that the "third party" is that entity. 4:18-22 (". . . third party that operates the application forms engine to which multiple institutions subscribe"); 4:48-54 ("application is preferably hosted by a third party to ease data sharing across institutions and electronic processing of application fees"); 4:56-57 (". . . each applicant is required to have an account with the third party servicer"); 4:60-63 ("Although the account is with third party servicer . . . application is being processed by third party servicer"); 5:31-36 (". . . transparent to the applicant that a third party is servicing the application, . . . the application is processed by a third party servicer"); 8:40-42 ("information remains available in the database of the third party servicer").

The parts of the specification cited by defendant indicate that the term "third party forms servicer" includes the entity hosting the forms engine, but the cited language does not limit the phrase to that entity. Because it is inappropriate to "read in" to a claim a limitation from the specification's general discussion, embodiments, and examples, Intel Corporation, 946 F.2d at 836, it is inappropriate to construe the phrase "third party forms servicer" with the limitation defendant suggests.

Defendant also points to two drawings in the patent in support of its position. First, defendant points to Figure 14 which is a diagram showing the interaction between the applicant, the forms engine, and the applicant database, as data is posted from an

51 - OPINION & ORDER

application form.  Exh. 1 to Apr. 21, 2003 Bricken Affid. at p. 29.

The corresponding discussion in the written specification provides:

> If the second stage validation is successful, user data
> 120 is written to the applicant database 62 and payment
> scripts 122 are executed in which the user is given an
> option to select any one of several of on-line payment
> methods.   Credit card information is verified from a
> credit card database 124.  After the information on the
> application is validated, it is transferred to the
> institution in a data format specified by the
> institution.  The information is also stored for use in
> subsequent applications in an applicant database 62,
> which is independent of the institution.

6:27-37.

Defendant argues that this discussion in the specification describes the payment scripts and the credit card database as being part of the third party forms servicer's system.  Defendant notes that there is no mention in the quoted passage that other entities or agents can operate the credit card database, or that the payment scripts come from an entity different than the third party forms servicer.

Figure 14 shows the credit card database as its own entity, however.  It does not show it as part of the forms engine itself.  But, Figure 14 also shows the applicant database, which the written specification suggests is maintained by the third party forms servicer, as its own entity as well.  Figure 14, and the quoted text regarding Figure 14, do not clearly support either party's position.

Defendant next relies on Figure 15 which "is a flowchart showing the products at each step of processing by forms engine 104 described" in Figures 13 and 14.  Exh. 1 to Apr. 21, 2003 Bricken Affid. at p. 30; 6:39-41.  The drawing contains a solid line around those functions performed by the forms engine with a separate box

52 - OPINION & ORDER

1  for the applicant and another for the institutions' database,
2  outside the solid line surrounding the forms engine's functions.
3  Id.  Included within the line showing the forms engine functions is
4  "payment 148."  Id.

5      The corresponding written specification discusses the
6  particular functions shown within the solid line box.  6:39-67 -
7  7:1-18.  The description regarding payment provides that "[a]
8  payment 148 is then processed and the application transaction
9  processing 150 is completed.  The forms engine then converts the
10 application information into a form compatible with the
11 institution's internal databases and delivers the information 152
12 to the institution's database 154."  7:13-18.

13     Defendant argues that given this description and the inference
14 defendant draws from Figure 15 that the payment processing is
15 something done by the forms engine servicer, no outside fourth
16 party entity is contemplated as part of the payment "processing"
17 function.

18     I disagree.  The specification language corresponding to
19 Figure 15 sheds no light on whether the disputed phrase "third
20 party forms servicer" includes an entity other than that hosting
21 the forms engine.  While defendant's inference from Figure 15
22 itself is not unreasonable given that the "payment" function is
23 shown inside the solid line encompassing the forms engine's
24 functions, it fails to account for the fact that a fourth entity
25 must be involved in the processing of an electronic payment because
26 of the nature of all electronic payments.

27     As explained in materials submitted by plaintiff, electronic
28 payments require the participation of several parties:  the

53 - OPINION & ORDER

1  consumer (here, the applicant), the merchant (here, the institution

2  via the business entity hosting the forms engine), the

3  clearinghouse (a financial intermediary which authenticates credit

4  cards and verifies account balances), the merchant bank (sometimes

5  called the "acquiring bank"), and the consumer's card issuing bank.

6  Exh. 2 to Apr. 21, 2003 Cleveland Declr. (Kenneth C. Laudon and

7  Carol Guercio Traver, E-Commerce: Business, Technology, Society

8  (2001)) at p. 291. Even if the business entity hosting the forms

9  engine were somehow to acquire the clearinghouse capacity, the

10  electronic payment processing still necessitates the participation

11  of two banks whose functions could hardly be acquired and performed

12  by a non-bank entity. Thus, to the extent Figure 15 suggests that

13  the forms engine host alone processes the electronic payment, it is

14  inaccurate.

15              c.  Prosecution History

16      Neither party cites any relevant evidence from the prosecution

17  history.

18              d.  Summary of Intrinsic Evidence

19      While the claims themselves do not contain any express

20  language regarding the use of a fourth party to perform processing

21  functions related to electronic payments, given the "comprising"

22  nature of the claims, the disputed claim language is most

23  reasonably interpreted to mean that "third party forms servicer"

24  includes the business entity hosting the forms engine, but is not

25  limited to such an entity, and excludes the public form user and

26  the institution of higher education.

27      The specification supports this interpretation by its

28  reference to an independent credit card database and by its

54 - OPINION & ORDER

1   additional reference to the third party "facilitating" the

2   settlement of an electronic payment.  Furthermore, given that one

3   of skill in the art would recognize that any electronic payment

4   feature by definition requires the use of fourth party banks at a

5   minimum, if the claims were to be drawn with the limitation as

6   defendant suggests, such a limitation would need to be expressly

7   stated.

8        Because the intrinsic evidence is unambiguous, I do not

9   consider any extrinsic evidence.  Vitronics Corp., 90 F.3d at 1584.

10       Accordingly, I adopt the parties' joint proposed constructions

11  of "form" "electronic payment" and "processing."  I further

12  construe the phrase "third party forms servicer" within the phrase

13  "processing by the third party forms servicer an electronic payment

14  associated with the form," as including the business entity hosting

15  the forms engine software, but not limited to that entity, and

16  excluding the public form user and the institution of higher

17  education.

18            2.   Performance    of    Custom    Data
                  Formatting/Mapping Claim Limitation
19                in Substantially Different Way By
                  Flagship System (Reverse Doctrine of
20                Equivalents)

21       Defendant contends that its Flagship System performs a

22  particular function of independent claims 1, 16, and 32 in such a

23  substantially different way than that claimed in the '042 patent,

24  that it should negate a finding of literal infringement.  Notably,

25  defendant does not make this argument regarding the performance of

26  this function by the i-Class system.

27       Defendant relies on the "reverse doctrine of equivalents"

28  which teaches that even if a claim limitation reads on an accused

55 - OPINION & ORDER

device, there is no infringement if the accused process is "so far changed in principle that it performs the function of the claimed limitation in a substantially different way." Smithkline Diagnostics, Inc. v. Helena Labs. Corp., 859 F.2d 878, 889 (Fed. Cir. 1988). Thus, defendant argues, even if there is apparent literal infringement of a claim limitation, if defendant's system is sufficiently different from that which is patented, the claims should be interpreted to negate infringement. Texas Instr., Inc. v. United States Int'l Trade Comm'n, 846 F.2d 1369, 1371 (Fed. Cir. 1988).

The function at issue is the custom data formatting/mapping function discussed above in regard to defendant's invalidity motion. Claim 1 contains the following limitation:

> processing by the third party forms servicer the user information in accordance with the preferences of the institution of higher education to which the form is directed to make the user information available to the institution in a format specified by the institution . . .

35:34-38. Independent claims 16 and 32 contain a similar limitation:

> providing by the third party forms servicer the user information to the institution to which the form is directed in a format specified by the institution . . .

36:49-51; 38:1-3.

Defendant contends that based on the claim language and certain parts of the specification, the claim should be interpreted to mean that the user data is converted at the server level to a custom-format specified by the institution and is then delivered in that custom-format to the institution's database, arriving at the institution's database in the custom-format, with no additional

56 - OPINION & ORDER

1   mapping or formatting required by the institution. I have already

2   construed the phrase in connection with defendant's invalidity

3   motion. The same construction applies here. Eaton Corp. v.

4   Rockwell Int'l Corp., 323 F.3d 1332, 1343 (Fed. Cir. 2003) (patent

5   claims are construed the same way for both invalidity and

6   infringement).

7   The construction adopted above is that user information

8   provided to the institution by the servicer is available in an

9   unlimited number of formats and is processed wholly by the third

10  party forms servicer and not the institution. That is, the

11  function is one of providing limitless formats for the transfer of

12  user information from the servicer to the institution with no

13  additional formatting or mapping performed by the institution.

14  Defendant's reverse doctrine of equivalents argument is

15  premised on its concession that the Flagship system literally

16  infringes the customized formatting/mapping function of the '042

17  patent because the system provides user data to the institution in

18  a format specified by the institution. See Texas Instr., 846 F.2d

19  at 1371 (explaining that there must first be literal infringement

20  before assessing whether the accused device is sufficiently

21  different from that which is patented under the reverse doctrine of

22  equivalents). However, based on the evidence in the record, I

23  conclude that there is a question of fact regarding the literal

24  infringement of the claims reciting this function given the

25  interpretation stated above. Thus, I need not reach the reverse

26

27

28

57 - OPINION & ORDER

doctrine of equivalents argument in resolving this motion.[6]

The evidence shows that defendant's Flagship system transforms user information into various formats. Exh. 12 to Apr. 21, 2003 Cleveland Declr. at p. 1555. The Flagship source code document provides that

> ApplyYourself can create files in various formats. Please select the format desired. The comma and tab-delimited formats are used to easily load the information into spreadsheet or database software such as Microsoft Excel and Microsoft Access or to produce mail-merge files for word processing programs like Microsoft Word. The fixed position file format is generally used for importing into mainframe systems. Note that variable length fields, such as comments, will have all line breaks removed.

Id. Although the document notes three types of formats, it does not indicate whether those are the only formats offered by the Flagship system or whether the three formats are mentioned only as

---

[6] I note, however, that should plaintiff successfully present evidence of literal infringement at trial, the reverse doctrine of equivalents may be available to negate a finding of literal infringement. I reject plaintiff's argument that the reverse doctrine of equivalents is no longer valid. Contrary to plaintiff's suggestion, I do not read Tate Access Floors to suggest that the doctrine has no applicability, but rather that the doctrine has limited applicability, reserved for those few cases where the claims are written more broadly than the disclosure warrants. Tate Access Floors, 279 F.3d 1357; Texas Instr., 846 F.2d at 1372; see also Donald S. Chisum, 5A Chisum on Patents § 18.04[4] & n.3 at pp. 18-754-55 (2003) noting that instances in which assertions of noninfringement are based on reverse equivalency are  statistically rare and citing cases to this effect). A likely cause of the infrequent use of the doctrine is that proper claim construction acts as an offensive "limitation" on the breadth of claims by referring to the claim language, written specification, and prosecution history and thus, proper claim construction usually obviates the need to defensively apply the reverse doctrine of equivalents to negate literal infringement. See Id. at § 18.04[4][c] at p. 18-760 ("[c]ourt decisions that acknowledge the vitality of the reverse doctrine of equivalents but find it inapplicable to the particular facts of the case before the court are legion.").

58 - OPINION & ORDER

1  examples of the more common formats but that the system can
2  actually transform the information to other formats. Thus, there
3  is a question of fact as to whether the Flagship system literally
4  infringes the '042 patent claims which require the transformation
5  of user information into limitless formats.

6      Also, the evidence demonstrates that with the Flagship system,
7  additional formatting or mapping is required by the receiving
8  institution. Exh. 8 to May 5, 2003 Bricken Affid. (Menasce
9  Rebuttal Disclosure) at pp. 11-13 (explaining that the user data,
10 regardless of the format desired by the institution must still be
11 translated by the institution at its local computer); see also Exh.
12 6 to May 5, 2003 Bricken Affid. (Costa Depo.) at pp. 4-5.

13     With this evidence, defendant creates an issue of fact as to
14 whether the Flagship system literally infringes the claims of the
15 '042 patent in which the "customized data formatting/mapping"
16 function appears.[7]

17         3.  Vague and Indefinite

18     Here, defendant again argues that the phrase "processing by
19 the third party forms servicer an electronic payment associated
20 with the form" is impermissibly vague under section 112, paragraph
21 2. Having already rejected this argument in the context of
22 defendant's motion, I do not consider it again.

23     Other than the section 112, paragraph 2 argument, defendant

24

25         [7]  The evidence regarding the additional formatting required
26 by the receiving institution under the Flagship system may be
   conclusive. However, defendant did not move for summary judgment
27 on the issue of noninfringement. Thus, given the context in
   which the evidence appears, as opposition to plaintiff's motion,
28 it suffices to say that the evidence creates an issue of fact.

1  presents no evidence in opposition to plaintiff's motion as to the

2  infringement of this limitation by defendant's i-Class system.

3  Thus, I grant plaintiff's motion as to the infringement of this

4  element by the i-Class system.

5                              CONCLUSION

6       Defendant's motion for summary judgment as to the invalidity

7  of the '042 patent (#104) is denied.  Plaintiff's motion for

8  summary judgment as to literal infringement (#111) is granted in

9  part and denied in part as follows:  the motion is granted in all

10 respects as to both patents and as to both of defendant's systems

11 except for the customized data formatting/mapping function claimed

12 in claims 1, 16, and 32 of the '042 patent as practiced by the

13 Flagship system.  The motion is denied in that regard.

14

15       IT IS SO ORDERED.

16

17            Dated this  7th  day of  July       , 2003

18

19                              /s/ Dennis James Hubel
                                Dennis James Hubel
20                              United States Magistrate Judge

21

22

23

24

25

26

27

28

60 - OPINION & ORDER