1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                  FOR THE DISTRICT OF OREGON

11  COLLEGENET, INC., a Delaware  )
    corporation,                  )
12                                )
                    Plaintiff,    )   Nos. CV-02-484-HU (LEAD CASE)
13                                )        CV-02-1359-HU
         v.                       )
14                                )
    APPLYYOURSELF, INC., a        )   OPINION & ORDER
15  Delaware corporation,         )
                                  )
16                  Defendant.    )
    ──────────────────────────────)
17

18  John D. Vandenberg
    Scott E. Davis
19  Kristin L. Cleveland
    KLARQUIST SPARKMAN, LLP
20  121 S.W. Salmon Street, Suite 1600
    Portland, Oregon 97204
21
    Robert A. Shlacter
22  STOLL STOLL BERNE LOKTING & SHLACTER, P.C.
    209 S. W. Oak, Suite 500
23  Portland, Oregon 97204

24       Attorneys for Plaintiff

25  Kathleen C. Bricken
    GARVEY SCHUBERT BARER
26  121 S.W. Morrison Street
    Portland, Oregon 97204-3141
27
    / / /
28
    / / /

    1 - OPINION & ORDER

Lawrence E. Carr III
Raymond C. Jones
Timothy Feely
CARR, MORRIS & GRAEFF, P.C.
1120 G Street, N.W., Suite 930
Washington, D.C. 20005

Attorneys for Defendant

HUBEL, Magistrate Judge:

Following a jury verdict in plaintiff's favor and the entry of final judgment along with injunctive relief, defendant moves for judgment as a matter of law (JMOL), or alternatively a new trial, on the issue of non-infringement of the '042 patent.[1] Presently, a stay of execution of the judgment, both as to money damages and injunctive relief, is in place until the issuance of this Opinion. Defendant moves to extend the stay pending resolution of eight other post-trial motions set for hearing on December 19, 2003.

For the reasons explained below, I grant defendant's JMOL/new trial motion on the issue of non-infringement of the '042 patent. I further grant in part defendant's motion to continue the stay.

STANDARDS

I.  JMOL

In analyzing a motion for judgment as a matter of law, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party.  Horphag Research, Ltd. v. Pellegrini, 337

---

[1]   In an October 28, 2003 Opinion & Order, I denied defendant's JMOL/new trial motion directed to lost profits based on defendant's failure to move for JMOL under Federal Rule of Civil Procedure 50(a) on the lost profits issue at the close of all the evidence.  Defendant's motion for reconsideration of that decision is set for hearing on December 19, 2003.  Thus, this Opinion and Order addresses only the JMOL addressing infringement of the '042 patent.

2 - OPINION & ORDER

F.3d 1036, 1040 (9th Cir. 2003).  To grant a motion for judgment as a matter of law, the court must find "no legally sufficient evidentiary basis for a reasonable jury to find" in favor of the nonmoving party."  Fed. R. Civ. P. 50(a)(1).

A judgment as a matter of law is proper when the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury.  Ostad v. Oregon Health Sci. Univ., 327 F.3d 876, 881 (9th Cir. 2003).  The court may not substitute its view of the evidence for that of the jury.  Costa v. Desert Palace, Inc., 299 F.3d 838, 859 (9th Cir. 2002), aff'd, 123 S. Ct. 2148 (2003).  The court is not permitted to make credibility determinations and it may not weigh the evidence.  Id.

II.  New Trial

The court may grant a new trial "for any of the reasons for which new trials have heretofore been granted[.]"  Fed. R. Civ. P. 59.  Those reasons include when "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice."  Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 819 (9th Cir. 2001) (internal quotation omitted); see also Union Oil Co. of Calif., 331 F.3d 735, 742 (9th Cir. 2003) ("trial court may grant a new trial only if the jury's verdict was against the clear weight of the evidence.").

When the new trial motion is based on insufficiency of the evidence, a "stringent standard" applies, and the motion should be granted only if the verdict "is against the great weight of the evidence or it is quite clear that the jury has reached a seriously erroneous result."  Johnson v. Paradise Valley Unifed Sch. Dist.,

3 - OPINION & ORDER

1  251 F.3d 1222, 1229 (9th Cir.) (internal quotation omitted), <u>cert.</u>

2  <u>denied</u>, 534 U.S. 1055 (2001).

3      Although the trial court may weigh the evidence and

4  credibility of the witnesses, "the court is not justified in

5  granting a new trial merely because it might have come to a

6  different result from that reached by the jury." <u>Roy v. Volkswagen</u>

7  <u>of Am., Inc.</u>, 896 F.2d 1174, 1176 (9th Cir. 1990) (internal

8  quotation omitted); <u>see also</u> <u>Union Oil Co.</u>, 331 F.3d at 743 ("It is

9  not the courts' place to substitute our evaluations for those of

10 the jurors."); <u>Silver Sage Partners</u>, 251 F.3d at 819 (a district

11 court may not grant a new trial simply because it would have

12 arrived at a different verdict).

13                              DISCUSSION

14 I.   JMOL Motion

15      A.   Literal Infringement of Claims 1, 16, and 32

16      Independent claims 1, 16, and 32 of the '042 patent share a

17 claim limitation concerning the processing of user information by

18 the third party forms servicer and the delivery of that information

19 to the client institution.  Two notable functions contained in that

20 claim limitation are what the parties and the Court have referred

21 to in the case as the "unlimited formatting" and "mapping"

22 functions.

23      I first construed the claim limitation in a July 7, 2003

24 Opinion resolving cross-motions for summary judgment.  July 7, 2003

25 Op. & Order at pp. 13, 57.  In a subsequent opinion resolving the

26 parties' motions for reconsideration, I amended the construction in

27 certain respects.  Aug. 20, 2003 Op. at p. 3.  I also rejected

28 plaintiff's argument that an interpretation requiring it to provide

4 - OPINION & ORDER

1   an unlimited number of formats was inconsistent with the claim
2   language and specification.  Id. at p. 4.  Finally, in an opinion
3   issued during the trial, I again clarified the claim construction.
4   Sept. 3, 2003 Op. at p. 9.

5       Based on the claim constructions, the jury was instructed on
6   the meaning of the claims as follows:

7           User information provided to the institution by the
            servicer is available in an unlimited number of formats
8           and is processed wholly by the third party forms servicer
            and not the institution.  That is, the function is one of
9           providing limitless formats for the transfer of user
            information from the servicer to the institution with no
10          additional formatting or mapping performed by the
            institution.
11
            This construction does not preclude formatting, mapping,
12          or other manipulation of the user information data by the
            institution once it is received by the institution in a
13          format the institution specified.

14          Any reference to "unlimited number of formats" and
            "limitless formats" should be interpreted to mean that
15          the third party forms servicer provides the user
            information to the institution in any format specified by
16          the institution.

17          "In a format specified by the institution" means in any
            file format, and it may include any other type of format,
18          specified by the institution.

19  Jury Instructions at p. 14.

20      Defendant argues that the evidence presented at trial is
21  capable of only one conclusion - that its Flagship and i-Class
22  products lack both the "unlimited formatting" and "mapping"
23  capabilities as they have been construed.

24          1.  Formatting Function

25      Defendant contends that Flagship transmits applicant data to
26  the institution in only one proprietary format, while i-Class
27  transmits the data in three finite file formats - fixed-width,
28  delimited, and Extensible Markup Language (XML).  Defendant relies

5 - OPINION & ORDER

on the following evidence:

1)  Exhibit 583 showing the i-Class source code regarding file formats;

2)  testimony of Gus Costa, defendant's Chief Technology Officer, that i-Class offers three file formats: fixed width, delimited, and XML (Vol. 6 Trial Trans. at p. 77);

3)  testimony of Len Metheny, defendant's Chief Executive Officer, that i-Class offers three file formats:  delimited, fixed width, and XML (Vol. 5 Trial Trans. at p. 132);

4)  Exhibit 582 showing the Flagship source code; and

5)  testimony of Brad Posner that Flagship supported a single format.

Based on this evidence, defendant argues that its products cannot literally meet the "unlimited" formatting limitation required by the '042 patent.  Defendant notes that rather than the institution specifying the file format as required by the patent claims, defendant specifies the file format(s) and the institution is forced to accept one the formats offered.  I agree with defendant that this is contrary to the claim language.

Defendant also notes that not only do its products not provide unlimited file formats, they do not provide at least one of the exemplary formats referred to in the '042 patent specification. The '042 patent lists five data file formats that might be included:  comma separated, tab delimited, fixed length, name/value pairs, and "EDI 189."  '042 patent at 21:1-4.  Defendant's witnesses, as well as plaintiff's expert Dr. Leonard Shapiro, testified that defendant's products do not provide EDI.  Vol. 6 Trial Trans. at p. 209 (Dr. Shapiro testimony).

6 - OPINION & ORDER

1    In addition, the evidence was that defendant cannot support

2    Datatel formats, nor can it support institutions that use MacIntosh

3    computers and those corresponding native file formats.  Vol 6 Trial

4    Trans. at pp. 133-34 (Metheny testimony that defendant does not

5    directly support Datatel and its programs are not compatible with

6    a Mac system).

7    Costa testified that EDI was the main export format that

8    defendant did not support.  Vol. 6 Trial Trans. at pp. 77-78.  He

9    explained that if a client asserts its preference to have an EDI

10   format, defendant cannot accommodate that request and the

11   institution would have to take the file in one of the three formats

12   defendant offers and then do something outside the system, within

13   its own system, to convert to whatever format is needed by the

14   institution.  Id.

15   Metheny also testified about one particular example of EDI

16   formatting requirements with Duke University.  Providing the data

17   to Duke required the services of a third party developer at the

18   University of Wisconsin, Madison, to convert the data from

19   defendant's third party forms server to Duke's PeopleSoft Student

20   Information System (SIS).  Vol. 4 Trial Trans. at pp. 244-47.

21   Testimony from Kent Eudy, Senior Software Architect of Nobelstar,

22   the third-party company which developed the i-Class product for

23   defendant, is consistent with that of Costa and Metheny.  Vol. 5

24   Trial Trans. at pp. 53-57.

25   Additionally, defendant's expert Dr. Daniel Menasce testified

26   that

27            [s]o when one looks at the ApplyYourself products,
          both I-Class and Flagship, one sees immediately that
28        that's not the case.  In fact, they provide a very

7 - OPINION & ORDER

1        limited number of formats.  For example, I-Class provides
only three formats[:] delimited, fixed length, and XML.

2        So there's no way that one could consider that, by any
stretch of the imagination, unlimited number of formats.

3

4              I can think of many very important formats in this
application domain that are not provided by ApplyYourself
products.  For example, EDI Transaction Set 189, which is

5        a very important type of format, is not provided.  HTML
is not provided.  Postscript is not provided.  Name/value

6        pairs is not provided.  Datatel is not provided.

7  Vol. 5 of Trial Trans. at pp. 195-96.

8      Defendant argues that in view of this evidence, no reasonable

9  jury could have found that defendant literally practices the

10  "unlimited formats" limitation of claims 1, 16, and 32.

11  Furthermore, defendant notes that any testimony to the contrary by

12  Dr. Shapiro is not sufficient evidence to support infringement

13  because he defined "format" contrary to the Court's construction of

14  the term.  This exchange reflects some problems with Dr. Shapiro's

15  analysis:

16        Q [by Mr. Carr questioning Dr. Shapiro regarding his
interpretation of the word "format" in the Court's claim

17        construction of "in any format specified by the
institution"]: Yes.  In that context, what do you mean

18        by format?

19        A:  A format refers to a style or shape or forms in which
files appear.  And there are generally three types of

20        formats.  One is called – I have to remember now.  But
one is called file formats, another is presentation

21        formats.  And another is character formats, as I recall.

22        Q:  Okay.  In the context of this paragraph, we're
talking about -

23

24        A:  Um-hmm.

25        Q:  -- do you understand that format phrase or term right
there to mean all three of those formats or to mean just

26        one?  Or just two of the three?

27        A:  The form – the one you've underlined here?

28        Q:  Yes, sir.

8 - OPINION & ORDER

1   A:  (Pause, referring).  I think this could mean any of
    the three.

2

3   Q:  So in your interpretation of – and your analysis,
    when you looked at this section, you understood that term
    right there, underlined on this form, "format," to mean
4   either a file format, a display format –

5   A:  Yes.

6   Q:  -- or a – what was the third option?

7   A:  File format, display format, or character format.

8   Q:  Or character format.

9   A:  Yes.

10  Q:  And your opinions reflected your understanding that
    this term "format" could mean any of those three?

11

12  A:  Yes -

    Vol. 4 Trial Trans. at pp. 190-91.

13

14      Plaintiff makes several arguments in opposition and offers

15  several interpretations of the evidence in support of the jury's

16  infringement verdict on the '042 patent.  Plaintiff's main

17  arguments are:  1) defendant admitted in its admissions that it

18  practices the patent; 2) defendant's provision of customized

    reports through its Web Center shows literal infringement; 3)

19  defendant's "Customized Integration Solutions" provide customized

20  file formats; and 4) the evidence shows defendant can customize the

21  provision of its data for upload to SISs such as PeopleSoft and

22  Datatel.

23

24          a.  Admissions

        Plaintiff correctly notes that defendant initially admitted in

25  its responses to plaintiff's requests for admission, that both

26  Flagship and i-Class "make[] user information available to an

27  institution of higher education in a format specified by that

28

    9 - OPINION & ORDER

institution of higher education."  These admissions were included
in plaintiff's Exhibit 165 (Requests for Admission Nos. 122, 123).
During his testimony, Metheny admitted that defendant had made the
admissions.  Vol. 5 of Trial Trans. at pp. 74-75.

I granted defendant's motion to withdraw these admissions in
an August 20, 2003 Opinion.  I instructed the jury that:

> In the discovery phase of a lawsuit one party may
> ask another party to admit or deny certain facts.  These
> are called Requests for Admission.  On January 29, 2003,
> defendant admitted certain facts when plaintiff made
> these requests.  Upon the request of defendant in August
> 2003, and after I made certain rulings in the case in
> July 2003, I allowed the defendant to withdraw two such
> responses, numbers 122 and 123.  The answers, while no
> longer being conclusive on these facts now that they have
> been withdrawn, nonetheless may still be considered by
> you in evaluating the evidence and resolving the facts of
> this case.  In evaluating statements made by a party you
> should consider whether the statement was clearly and
> understandingly made by that party.

Jury Instructions at p. 50.

Plaintiff argues that because the jury was not told what the
actual July 2003 rulings were which led to the withdrawal of the
admissions, and because there was no cross-examination of Metheny
regarding these admissions, the jury could have concluded that
defendant admitted infringement of these claim features as they had
been construed by the Court.  Plaintiff argues that there could be
no stronger evidence of infringement.

I disagree.  Given the testimony and the jury instruction, the
jury knew only that at one point earlier in the case, defendant
admitted that its systems had performed a certain function.
Importantly, the jury also knew that based on a court ruling, those
admissions had been withdrawn and thus, defendant no longer
admitted that it practiced that function.  Even if the jury were

10 - OPINION & ORDER

unaware that it was the claim construction ruling that altered the landscape, the withdrawn, non-binding admissions are not substantial evidence of infringement of this function. Furthermore, if the jury based its infringement verdict on these withdrawn admissions, it would be error. The withdrawn admissions are not a legally sufficient basis upon which a reasonable juror could find literal infringement.

### b. Web Center

Plaintiff next argues that defendant's provision of customized reports through defendant's Web Center is evidence of infringement. In particular, plaintiff relies on Exhibits 80, 82, and 86.

Plaintiff's argument is based on a strained and unsupported reading of the claim construction. Plaintiff contends that the words "file format" in the claim construction part of the jury instructions quoted above, could have been reasonably understood by the jury as including at least a "form" and "layout" file. Plaintiff notes that while the instructions defined "file" as "[a]n electronically stored collection of information that has a unique name," Jury Instructions at p. 13, the instructions did not define the term "file format." Thus, plaintiff argues, the jury was obligated to construe "file format" according to its ordinary meaning, which plaintiff contends is "the format of a file."

Plaintiff notes that Wolfston testified that "file format" meant "the way the data gets laid out," or the ordering of data. Vol. 2 Trial Trans. at pp. 178-79. Additionally, plaintiff contends that the i-Class manual suggests a broad meaning of "file format" when it explains how to "define" a "file format." Under the section on "file format definitions," the manual describes,

11 - OPINION & ORDER

according to plaintiff, unlimited variations, including countless permutations on the selection and widths of fields in the customized report - implying that each is a separate file format. Exh. 80 at pp. 76-77.

Thus, because, according to plaintiff, the term "file format" could have reasonably been interpreted by the jury as including "form" and "layout" file formats because they are an electronically stored collection of information with a unique name, the jury was entitled to conclude that defendant's provision of customized reports from its Web Center met the claim limitation of providing file formats specified by the institution to the institution.

Plaintiff argues:

> ApplyYourself provides customized reports of applicant data to institutions.  These reports were "files" as defined in the Jury Instructions:  they are stored as a "collection of information" (i.e. application data) and each report has a unique name.  The format of these customized reports thus was a file format. Moreover, the unlimited format variations for these reports are specified by the institutions, as indicated in the i-Class manual (See Trial Ex. 80 at 40-44, 76-77). Given the Court's definition of "file," and the ordinary meaning of "format," it would have been **unreasonable** for the Jury **not** to consider these customized reports provided by ApplyYourself to have customized file formats.

Pltf's Opp. Mem. at p. 15.

Plaintiff also cites to Dr. Shapiro's testimony:

> I think that at this point the ApplyYourself and Flagship products provide to their users any file formats that the users desire.  I think they provide to their users any character formats that the users desire.  I think they provide to their users any presentation formats that the users desire.  I think they provide file formats through the export facilities.  I think they provide presentation and character formats through the display Web facilities.  And all of those, the export facility and the Web display facilities, are provided through their product called the Web center.

12 - OPINION & ORDER

1  Vol. 4 of Trial Trans. at p. 192.

2      I reject plaintiff's "customized report" argument.  Under the
3  Court's claim construction, the third party forms servicer must
4  provide user information to the institution in a file format
5  specified by the institution such that no additional manipulation
6  of the data is required by the institution before the institution
7  can upload it into its own system.  If the jury interpreted "file
8  format" to include layout or display formats, the interpretation is
9  contrary to the governing claim construction.  The "customizable
10 report" evidence regarding what is available through the Web Center
11 is not substantial evidence that information was provided to the
12 institution in a <u>file</u> format as I intended the meaning of file
13 format in the claim construction.

14      The way that plaintiff attempts to alter the claim
15 construction is flawed and reverses the Court's claim construction.
16 In the Court's claim construction, "file" modifies "format" to
17 distinguish among the various types of "formats" such as display
18 formats, layout formats, etc.  That is, the claim limitation
19 requires that the server provide at least an unlimited number of
20 <u>file</u> formats.

21      Plaintiff's argument depends on a reading of "file format"
22 such that "format" modifies "file," rather than "file" modifying
23 "format."  Plaintiff's interpretation is contrary to the Court's
24 claim construction and I conclude that the jury could not have
25 reasonably relied on the evidence at trial regarding the Web Center
26 reports as substantial evidence that defendant's products practice
27 the <u>file</u> format claim limitation.  To do so, the jury would have
28 had to ignore the Court's claim construction for "file format."

13 - OPINION & ORDER

1    Additionally, the i-Class manual does not support plaintiff's
2    suggestion that defendant itself interpreted "file format" as
3    including "countless permutations" on the selection of fields, etc.
4    One of the sections of the manual relied on by plaintiff addresses
5    the creation of report templates but does not address file formats.
6    Exh. 80 at pp. 40-44.

7    The other instructs the user that the user will have to select
8    a particular file format. Id. at pp. 76-77. It makes clear that
9    there are only three file format choices: delimited, fixed width,
10   and XML. Id. Within each type of file format, the user can make
11   choices such as whether to have tab or character as the delimiter
12   in the delimited file format, or the width of the field (by the
13   number of characters in each field) in the fixed width file format.
14   This is not substantial evidence that defendant's accused devices
15   included unlimited formats. Nor can this facet of defendant's
16   systems alter the proper construction of plaintiff's patent claims
17   such that the term "file format" includes layout and display
18   formats. Furthermore, as always, the Court's construction of the
19   term in plaintiff's patent claims as meaning file formats is not
20   influenced by the manual for defendant's accused device. Evidence
21   of the variety of display and layout formats defendant provides
22   cannot define the types of formats claimed by plaintiff's patent.

23   Finally, Dr. Shapiro's testimony on this issue is not
24   substantial evidence that the provision of Web Center reports meets
25   the claimed function as interpreted because his definition of "file
26   format" conflicts with the claim construction. Vol. 4 Trial Trans.
27   at pp. 190-91 (Dr. Shapiro admitting that his interpretation of
28   "format" in a claim construction phrase included display and

14 - OPINION & ORDER

1  character formats as well as file formats).

2              c.  "Customized Integration Solutions"

3      Several of defendant's marketing and other materials refer to

4  its "customized integration solutions." <u>See</u> Exh. 73 at pp. 19, 71;

5  Exh. 82 at p. 5; Exh. 88 at p. CNA670; Exh. 259.  Many of these

6  references appear to tout defendant's ability to provide data from

7  defendant's server to its client institutions' SISs without the

8  institutions re-keying the data.[2]  Plaintiff suggests that by

9  providing these "customized" solutions, defendant effectively

10 provides user data in unlimited file formats.

11     The testimony indisputably established that for institutions

12 who use defendant's Flagship program, defendant's server provides

13 data in only one file format.  Vol. 6 Trial Trans. at pp. 35-37

14 (Posner Testimony).  Each institution was required to install a PC-

15 based software system, separate from Flagship, on the institution's

16 own computer to make use of the data the institution received from

17 defendant's server.  As Posner explained, it was necessary for the

18 institution to run this software, known as "Application Information

19 Manager" or "AIM," to "make sense of the data they were receiving"

20 from defendant's server.  <u>Id.</u>

21     For institutions signed up with i-Class, defendant's server

22 provides data in the three file formats discussed above.  I-Class

23 eliminated the need for the PC-based AIM software, but the

24

25      [2]  I note that "[m]isleading statements about what a product
   does, in the absence of proven efficacy," do not establish a
26 patent violation.  <u>Upjohn Co. v. Riahom Corp.</u>, 641 F. Supp. 1209,
   1220 (D. Del. 1986).  Thus, advertising or marketing materials
27 which suggest that the accused device may infringe may not prove
   infringement if the accused device does not actually work the way
28 it is advertised or marketed.

15 - OPINION & ORDER

1    institution still must map the data it receives from defendant's
2    server to the school's SIS. E.g., Vol 6 Trial Trans. at pp. 78-79
3    (Costa testimony that data transmitted from defendant's server to
4    a school is not automatically loaded into that school's SIS and
5    requires some "work" at the receiving end before the data coming
6    from defendant's system is functional for the school); Id. at pp.
7    55-56 (Eudy's testimony that the school would have to take the
8    "extract" file, write a program that would do a conversion, and
9    then import it into their system); see also Exh. 259 (defendant
10   notes that by combining a particular "integration solution"
11   designed by a third party with defendant's product, the institution
12   can avoid hand entering any data).

13        Plaintiff argues that while defendant tries to draw
14   distinctions between the parts of its systems by contending that a
15   third party software program is required to map the data from
16   defendant's server to the institution's SIS (and by doing so
17   provide unlimited file formats), defendant fails to note that
18   defendant is the exclusive distributor of that third party software
19   program that allows the application information to be directly
20   uploaded into, for example, the PeopleSoft SIS.    Exh. 259.
21   Plaintiff argues that defendant's characterization of this data
22   mapping and formatting function as being performed by a separate or
23   additional "custom coding" or program, is a distinction without a
24   difference.

25        Trial testimony from defendant's witnesses, uncontradicted by
26   plaintiff, was that the "custom integration solution" is a product
27   external to the actual Flagship or i-Class product.    The Flagship
28   and i-Class programs reside on defendant's server to provide the

16 - OPINION & ORDER

1  forms to applicants and the user data to the institution.  Trial

2  testimony further established that defendant could provide the

3  "custom integration solution," or that the institution itself could

4  write its own "translation" program or hire an independent third-

5  party to craft one.  While defendant is the exclusive distributor

6  of a particular "customized integration solution," no evidence

7  suggested that an institution was bound to purchase defendant's

8  "customized integration solution" translation product along with

9  its purchase of the underlying Flagship or i-Class product.

10     What plaintiff argues is that the seller of a particular

11  product which does not literally infringe because it does not

12  perform a particular claim function (here, providing unlimited file

13  formats), may nonetheless literally infringe by offering for sale

14  an additional product, for an additional cost, that may make the

15  non-infringing product work like the patented product, or process.

16  When I asked plaintiff at oral argument if it had any law directly

17  on point on this issue, plaintiff had none and did not request an

18  opportunity to supply authority at a later time.  Furthermore,

19  plaintiff never argued at trial that the "accused devices" included

20  the additional product.  Rather, plaintiff focused only on the

21  Flagship and i-Class products.

22     More importantly, and focusing here solely on the file

23  formatting function, the fact remains that the third party forms

24  servicer is still not providing unlimited file formats.  Even with

25  the "custom integration solution," and even if the institution uses

26  the solution provided by defendant, defendant's server provides the

27  user data in one of three formats and it is the "custom integration

28  solution" which translates the data from one of those formats to

17 - OPINION & ORDER

1  the institution's format.  Thus, the data is not "processed wholly
2  by the third party forms servicer" as required by the claim
3  construction.  As a result, the evidence plaintiff presented for
4  the proposition that defendant provides "custom integration
5  solutions" was not substantial evidence supporting a verdict of
6  literal infringement.

7                     d.  Dr. Shapiro's XSL Testimony

8      Dr. Shapiro testified regarding "XML Style Sheet Language,"
9  commonly referred to as "XSL."  The essence of his testimony was
10  that because defendant, at least with its i-Class product, provides
11  user data in an XML file format, defendant can use XSL as a
12  "transform" mapping tool and convert the XML file to an unlimited
13  number of formats, including the EDI format.  Vol. 6 Trial Trans.
14  at pp. 163-66, 203-09.  While Dr. Shapiro conceded that defendant
15  did not currently support EDI, Vol. 6 Trial Trans. at p. 209,
16  plaintiff argues that Dr. Shapiro's testimony regarding XSL is
17  substantial evidence that defendant's systems literally infringe
18  the '042 patent.

19     I reject this argument.  First, there is no evidence that
20  Flagship provides data in an XML file format so any XSL translation
21  program accomplishes nothing for Flagship on this record.  Second,
22  there is no evidence that i-Class currently provides the XSL
23  translation program.  Third, there is no evidence that any of
24  defendant's "custom integration solutions" carry the XSL
25  translation program mentioned by Dr. Shapiro.  His testimony
26  suggested that one could write such a program, not that defendant
27  offers one either in its Flagship or i-Class products, or separate
28  from them.  The fact that the technology exists and that defendant

18 - OPINION & ORDER

1  could incorporate it into its products it if wanted to, is not

2  substantial evidence that defendant currently infringes.

3      This is not a case where a device is capable of an infringing

4  use along with a non-infringing use.  E.g., Hilgraeve Corp. v.

5  Symantec Corp., 265 F.3d 1336, 1343 (Fed. Cir. 2001) (an accused

6  device may be found to infringe if it is reasonably capable of

7  satisfying the claim limitations, even though it may also be

8  capable of non- infringing modes of operation), cert. denied, 535

9  U.S. 906 (2002); Huck Mfg. Co. v. Textron, Inc., 187 U.S.P.Q. 388,

10  408 (E. D. Mich. 1975) ("The fact that a device may be used in a

11  manner so as not to infringe the patent is not a defense to a claim

12  of infringement against a manufacturer of the device if it is also

13  reasonably capable of a use that infringes the patent.")  Here, the

14  XSL translation program is a product or program available in the

15  marketplace (or in the mind of any particular programmer) but is

16  not presently part of defendant's system.  Thus, the fact that one

17  may write an XSL transform mapping program which may allow for

18  translation of defendant's three file formats provided by i-Class

19  into an unlimited number of formats, including EDI, is not

20  substantial evidence that defendant's systems, as they presently

21  exist, literally infringe the '042 patent.

22            e.  Other Arguments

23      While plaintiff's arguments regarding the admissions, web

24  center, "customized integration solutions," and XSL program appear

25  to be its primary arguments, plaintiff raises some additional

26  points as well.  First, plaintiff indicates that the word "any" in

27  the claim construction quoted earlier in this Opinion, was not

28  defined for the jury.  Plaintiff argues that the ordinary meaning

19 - OPINION & ORDER

of "any" does not necessarily imply "an unlimited number," "limitless," or an infinite number. As such, plaintiff argues, the jury could have understood "any" to mean "one" or "a." Thus, plaintiff continues, the jury could have construed the words "any file format" in the phrase from the jury instructions "the information is made available in any file format specified by the institution," to mean "one file format." Accordingly, plaintiff's argument goes, the jury could have found infringement because defendant offers three formats, and by offering just one, it infringes.

This argument cannot be sustained in light of the claim construction, regardless of the fact that the jury was not given a definition of "any." The plain meaning of "any," in this particular context, cannot be reasonably understood to mean "one."

Next, plaintiff contends that the jury instructions did not restrict the jury to finding that either all or none of defendant's systems as provided to particular schools infringed. In other words, plaintiff argues, the jury was free to decide that defendant infringed when it provided a file format specified by "School A," but did not infringe when it failed to provide a file format specified by "School B." This argument is also unpersuasive. Defendant's systems do not satisfy the claim limitation, as I have construed it, of providing "unlimited file formats" by providing one of its three formats to a particular school in response to that school's specification. Further, I recall no evidence regarding either of defendant's accused devices satisfying any particular school's specification.

Finally, plaintiff contends that the jury instructions did not

20 - OPINION & ORDER

1   require the jury to consider hypothetical future specifications of

2   schools.    Rather, the jury was to consider what schools had

3   actually specified, not what they might specify or could specify.

4   The jury was not told that there can be no infringement if an

5   institution might one day in the future specify a file format that

6   defendant does not or would not provide.  Plaintiff argues that the

7   only tense of the word "specify" in the jury instructions is the

8   past tense "specified." Thus, if an institution specified a format

9   that   defendant   provided,   then   the   jury   was   free   to   find

10  infringement under the claim construction.

11      This argument, as with others offered by plaintiff, hinges on

12  a claim construction contrary to the Court's construction.  It is

13  also   without   evidentiary   support   for   literal   infringement.    I

14  reject it on those bases.

15          2.  Mapping Function

16      The claim construction relevant to the "mapping" function is

17  the   same   as   for   the   "unlimited   file   format"   function   set   out

18  earlier   in   this   Opinion.     Defendant   argues   that   substantial

19  evidence does not support a conclusion that its systems meet this

20  claim limitation.

21      As   noted   above,   institutions   using   defendant's   Flagship

22  product required the use of the PC-based AIM software program to

23  translate the user data received from defendant's servicer into the

24  institutions'   SIS.    Vol.   6   Trial   Trans.   at   pp.   35-37   (Posner

25  Testimony).    As   for   i-Class,   other   evidence   recited   above

26  demonstrated the need for a separate customized mapping program in

27  order for institutions to have a seamless transformation of user

28  data received from defendant's server into their SIS. E.g., Id. at

21 - OPINION & ORDER

1   pp. 78-79 (Costa Testimony); Id. at pp. 55-56 (Eudy Testimony); Vol
2   4 Trial Trans. at pp. 244-47 (Metheny Testimony).  The evidence is
3   undisputed that these programs reside with the institution, not on
4   defendant's server.  E.g., Vol. 5 Trial Trans. at p. 82 (Metheny
5   Testimony).

6        There are only two arguments plaintiff makes addressed
7   directly to the mapping function that require discussion beyond
8   what I have already discussed above in connection with the
9   formatting function.  First is the "customized integration
10  solution" argument.  Plaintiff contends that by providing a
11  "customized integration solution," and particularly by being the
12  exclusive distributor of one particular such solution, defendant
13  not only provides unlimited file formats, but also performs the
14  mapping function as construed by the Court.  Because, plaintiff
15  argues, the "customized integration solution" translates or
16  transforms the data received from defendant's server, the user
17  information is received by the institution for use directly by the
18  institution's SIS with no additional formatting or mapping
19  performed by the institution.

20       While I agree with plaintiff that the institution is not
21  required to further format or map the data once it receives it from
22  the customized translation program, I reject plaintiff's argument.
23  The Flagship or i-Class products when used in combination with this
24  additional piece of software (which again, may be designed by the
25  institution itself, by an independent third-party, or provided by
26  defendant), may meet the "mapping" claim limitation as it has been
27  construed.  However, this combination is not the accused device
28  that plaintiff made its claim against.

22 - OPINION & ORDER

1    Furthermore, the fact that the customized translation program

2  resides within the institution distinguishes defendant's products

3  from the "mapping" claim in the '042 patent.   The institution is

4  still required to map or format the data received from defendant's

5  server.   While this mapping or formatting is done outside of the

6  SIS and the institution is able, after the data is manipulated by

7  the custom translation program, to seamlessly integrate the data

8  into its own SIS, the burden is still on the institution to map or

9  format the data.  I acknowledge that the institution does not have

10 to manually re-key the data when defendant's systems are paired

11 with a custom translation program.   Nonetheless, the institution is

12 still burdened with acquiring and programming, or having the

13 additional custom translation program properly coded, requiring the

14 institution to perform additional formatting or mapping upon

15 receipt of the user data from defendant's third party forms server.

16    Second, plaintiff points to defendant's admissions in response

17 to plaintiff's requests for admission, that i-Class and Flagship

18 can relieve institutions of the administrative burden of processing

19 web-based forms.  Exh. 49 (Requests for Admission Nos. 128, 129).

20 The discussion above shows that the evidence supports this

21 admission because the accused products, together with an external

22 translation program residing within the institution, can ultimately

23 relieve the institution of manually re-keying data.   This

24 admission, however, is not tantamount to substantial evidence of

25 literal infringement of defendant's accused systems for the reasons

26 previously explained.  The institution is still responsible for the

27 mapping or formatting of the data by virtue of having to acquire

28 and host the custom translation program.  Thus, there is still a

23 - OPINION & ORDER

1   burden on the institution.  Accordingly, the jury's verdict as to

2   the mapping function is not supported by substantial evidence.

3       In summary, to sustain a claim of literal infringement, "each

4   limitation of the claim must be present in the accused device."

5   Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1330

6   (Fed. Cir. 2001).  "Any deviation from the claim precludes" a

7   literal infringement finding.  Id.  This "all elements" rule

8   requires the patentee to prove that the accused device itself

9   contains each limitation of the asserted claims.

10      In this case, the evidence is capable of only one reasonable

11  conclusion:  defendant's Flagship or i-Class products do not

12  contain the "file format" or "mapping" claim limitations of claims

13  1, 16, and 32 of the '042 patent.  Substantial evidence in the

14  record, when viewed with the Court's claim construction and the

15  jury instructions, demonstrates that the only reasonable conclusion

16  this jury could have reached was one of no literal infringement of

17  these claims of the '042 patent.

18      B.  Literal Infringement of Claim 38

19      Claim 38, while still addressing the same overall process, is

20  distinct from claims 1, 16, and 32.  It provides:

21          A method of processing over a computer network forms
            directed by multiple public forms users to institutions,
22          the forms process being administered by a third party
            forms servicer that is neither one of the institutions
23          nor one of the public forms users, the method comprising:

24              receiving by an institution from a third party
                forms servicer user information in a format
25              specified by the institution, the user information
                being derived from a form customized for the
26              institution and identified primarily with the
                institution rather than with the third part[y]
27              forms servicer, the customized form being presented
                to a form user over a computer network by the third
28              party forms servicer, the customized form including

24 - OPINION & ORDER

1    fields for data to be inserted manually by the
2    forms user or automatically, [t]he information in
     the completed form being posted to the third party
3    forms servicer; and

4    receiving from the form user via the third party
     form servicer an electronic payment associated with
5    the customized form;

6    thereby providing to the form user a customized
     form identified with the institution and <u>providing</u>
7    <u>the institution with custom-formatted data and an</u>
     <u>electronic payment, while relieving the institution</u>
8    <u>of the administrative burden of processing forms</u>
     <u>and payments.</u>

9    '042 Patent at 38:38-61 (emphasis added).

10        Defendant's infringement of claim 38 was not directly

11   addressed at summary judgment because plaintiff did not move for

12   summary judgment as to the literal infringement of claim 38.

13   However, the term, or concept, of providing a "customized form"

14   which is part of claim 38, is a part of several claims that were

15   adjudicated on summary judgment.  July 7, 2003 Op. & Order at p.

16   35.  The July 7, 2003 Opinion specifically noted that the

17   "customized form" limitation appeared in several claims in both the

18   '278 and '042 patents and that while it was being addressed in the

19   context of claim 1 of the '278 patent, the discussion of the

20   limitation applied "to the other claims in either patent."  <u>Id.</u> at

21   p. 35 n.5.

22        In resolving the summary judgment motions, I interpreted the

23   claim term "customized form" as "a form made according to the

24   preferences of each particular institution."  <u>Id.</u> at p. 36.  In

25   doing so, I rejected defendant's argument that the term contained

26   a concept of "transparency," meaning that the customized form

27   contain no indicia that the application is hosted by the forms

28   service provider.  <u>Id.</u> at pp. 36-37.  As a result, I concluded that

25 - OPINION & ORDER

defendant failed to create an issue of fact regarding the accused systems' practice of the "customized form" limitation in either the '278 or the '042 patent.  Id. at p. 37.  I granted plaintiff's motion for literal infringement as to the '042 patent except for the formatting and mapping functions.  Id. at p. 60.

In the present JMOL motion, defendant argues that the evidence at trial established that its products do not provide a custom application form according to the preferences of each institution. While providing some flexibility, defendant's products, which use a template-driven forms interface, somewhat restrict the institution's customization preferences.  See Vol. 4 Trial Trans. at p. 204 (Dr. Shapiro Testimony).  Defendant argues that in view of Dr. Shapiro's unequivocal admission that defendant uses a non-infringing public domain software package to provide forms to users that cannot provide unlimited customization, no reasonable jury could have found that defendant practices the "custom forms" limitation of claim 38, and therefore, there is no literal infringement of that claim.

While plaintiff did not move for summary judgment on claim 38, plaintiff argues in opposition to the JMOL motion that the summary judgment decision precluded defendant from trying the "customized form" limitation to the jury and thus defendant should be precluded from raising it here.  I need not resolve this issue because I determine that even apart from the "customized form" limitation, substantial evidence does not support the verdict of literal infringement of claim 38.

Claim 38, like the other independent claims in the '042 patent, requires the receipt by the institution from the third

26 - OPINION & ORDER

party forms servicer of "user information in a format specified by
the institution . . . ."  The interpretation of the same phrase in
the other claims of the patent, defines this phrase to mean "in any
file format, and it may include any other type of format, specified
by the institution."  The jury was instructed on the construction
of this phrase as it appears in claim 1, but it is the same phrase
in claim 38.  The jury was further instructed that "[t]erms given
a meaning in one place in the patent, either by [the Court] or by
[the jury], have that same meaning in all other places in the
patent that the term appears."  Jury Instructions at p. 11.

        Having rejected plaintiff's arguments as to claims 1, 16, and
32 regarding "any file format," and concluding that there is no
substantial evidence of literal infringement of the "in a format
specified by the institution" function in claims 1, 16, and 32,
there is similarly no substantial evidence supporting the literal
infringement of that same function in claim 38.

        C.    Infringement of Claims 1, 16, 32, and 38 Under
              the Doctrine of Equivalents

        Because the verdict did not ask the jury to distinguish
infringement liability based on literal infringement and
infringement under the doctrine of equivalents, to succeed on the
JMOL motion, defendant must show that there is a lack of
substantial evidence supporting the verdict under both infringement
theories.

        In a 1998 case, the Federal Circuit explained that its "prior
cases stand for the proposition that mere generalized testimony as
to equivalents is insufficient as a matter of law to support a jury
verdict finding infringement under the doctrine of equivalents."

27 - OPINION & ORDER

1  Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1188

2  (Fed. Cir. 1998).  As the court further explained:

3       We have also previously stated that the evidence and
        argument on the doctrine of equivalents cannot be merely
4       subsumed in plaintiff's case of literal infringement. .
        . . Rather, a patentee must prove substantial identity as
5       to each of the function, way and result prongs of the
        doctrine of equivalents. . . . The thrust of these cases
6       is to ensure that a jury is provided with the proper
        evidentiary foundation from which it may permissibly
7       conclude that a claim limitation has been met by an
        equivalent.

8  Id. (internal quotations and citations omitted; emphasis added).

9

10      In a more recent case, the court reiterated that to sustain a

11 claim of infringement based on the doctrine of equivalents, the

12 patent holder must provide evidence "on a limitation-by-limitation

13 basis" and the "evidence must have included particularized

14 testimony and linking argument" to properly assist the factfinder

15 in making the doctrine of equivalents determination.  Hewlett-

16 Packard Co. v. Mustek Sys., Inc., 340 F.3d 1314, 1322 (Fed. Cir.

17 2003) (internal quotation omitted); Lear Siegler Inc. v. Sealy

18 Mattress Co. of Mich., Inc., 873 F.2d 1422, 1426 (Fed. Cir. 1989)

19 (noting these requirements are necessary to ensure that the

20 factfinder is not "put to sea without guiding charts when called

21 upon to determine infringement under the doctrine [of

22 equivalents].").

23      Defendant argues that plaintiff failed to meet its evidentiary

24 burden under these standards.  Defendant notes that plaintiff

25 presented no evidence in its case-in-chief regarding equivalents.

26 See Vol. 6 Trial Trans. at p. 204 (exchange between Court and

27 plaintiff's counsel in which plaintiff's counsel concedes that

28 there were no "explicit arguments" made in its case in chief as to

28 - OPINION & ORDER

1  infringement under the doctrine of equivalents).  I agree with
2  defendant that the only evidence relevant to plaintiff's doctrine
3  of equivalents theory came in plaintiff's rebuttal case.

4      The substance of the relevant testimony on doctrine of
5  equivalents is revealed in the following exchange between
6  plaintiff's counsel and Dr. Shapiro:

7      Q: Okay.  Dr. Shapiro, can we assume for a moment that
       Dr. Menasce is right, that ApplyYourself can't literally
8      provide any format selected from among an unlimited or a
       limitless number of possibilities.
9
10     Do you have an opinion as to whether what – the formats
       ApplyYourself does provide would be similar to the – the
       meaning of the claim term that I had in front of you, and
11     took down?

12         MR. CARR: Objection, Your Honor.  Irrelevant.
           Goes to doctrine of equivalents, hasn't been
13         raised.

14         THE COURT: Overruled.

15     THE WITNESS: If in some sense there's some literal way
       in which this transformation could not be accomplished,
16     through an XSL transform, you would get the same result.

17     BY MR. DAVIS:

18     Q: So are there any differences, then, in this modern
       world?
19
20     A: No, I think – you know, one could say – and perhaps
       this is what Dr. Menasce is saying.  He's saying that,
       you know, literally, we only offer these exact formats.
21
22     Then I interpret your question as saying,

23     Dr. Shapiro, do you get the same result if you first
       write an XSL transform, and transform XML into a
       different format?  Do you get equivalently the same thing
24     as if ApplyYourself offers the literal format?  Do you
       get the same result as if you apply this transformer that
25     takes a short amount of time to write?

26     And I say, yes, it's the same thing.

27     In other words, if my grandfather offers the color paint
       in the window, is it equivalent if he offers it in the
28     window or if he goes in the back room and takes ten

29 - OPINION & ORDER

minutes and mixes up a new color? Is that equivalent, as
far as the customer is concerned? In any event, the
customer walks out of the store with the color the
customer wants.

Same thing with the school. The school walks out with —-
as the claim construction says, the school gets —- can
you put the claim construction up there again?

Vol. 6 Trial Trans. at pp. 165-66.

Defendant argues that this evidence is insufficient to
establish doctrine of equivalents infringement under the standards
required by the Federal Circuit, of either the mapping or the
unlimited formatting functions. As to the mapping function,
defendant notes that data mapping is a binary feature in that the
product or process provided by defendant to the institutions either
has the capability to perform data mapping or it does not.
Accordingly, defendant argues, if the institution is required to
perform "additional formatting or mapping" after receiving the data
from defendant, there is no infringement, either literally or under
the doctrine of equivalents.

As to the unlimited format function, defendant notes that as
with mapping, the provision of unlimited formats is a binary
feature. The product or process provided by defendant to its
institutions either has the capability to provide unlimited formats
or it does not. The evidence, according to defendant, shows that
it does not.

Defendant argues that plaintiff's testimony on rebuttal
provides no analysis for finding infringement under the doctrine of
equivalents because it did not discuss the provision of the "same
function, substantially the same way, producing substantially the
same result." Defendant contends that plaintiff presented nothing

30 - OPINION & ORDER

1    more than "generalized testimony as to overall similarity" which is
2    insufficient to establish infringement under the doctrine of
3    equivalents.

4        Furthermore, defendant argues, Dr. Shapiro's testimony is of
5    no consequence because there is no evidence that defendant uses an
6    XSL converter for custom data formatting.  For example, defendant
7    cites to the i-Class manual which contains no references to XSL in
8    the documentation for formatting, mapping, or exporting data.  Exh.
9    80.  Defendant also maintains that similarly, there is no evidence
10   that Flagship uses an XSL converter to transform XML data into
11   other formats.   Defendant contends that plaintiff's infringement
12   theory "collapses" because it is based on an "imaginary product"
13   that could use XSL to transform an XML file format to any other
14   file format, but it is not based on defendant's actual product.  As
15   defendant argues, "[i]t is axiomatic that it is the <u>accused</u> device
16   or process at issue that must perform the equivalent limitation to
17   find infringement."  Deft's Mem. at p. 27.

18       In response, plaintiff argues that there are four ways the
19   jury could have concluded that the accused systems and methods were
20   equivalent to the claimed systems and methods:  1)  the provision
21   of "customized reports" from defendant's Web Center; 2)  the
22   "customized integration solutions" in which plaintiff alleges that
23   defendant provided data in any format necessary for export without
24   the institution needing to re-key any of the data; 3) the provision
25   of XML which plaintiff contends is a "universal format"; and 4) the
26   ability of i-Class to provide different field formats, presentation
27   formats, fixed width variations, and delimiter variations.  These
28   arguments are substantially the same as the ones raised in

31 - OPINION & ORDER

1   opposition to the JMOL motion on literal infringement.  I address

2   them  here  in  the  context  of  the  doctrine  of  equivalents

3   infringement issues.

4       As to the first argument regarding customized reports from the

5   Web Center, plaintiff contends the provision of such reports is at

6   least  equivalent  to  the  required  functionality  of  providing  any

7   file format specified by the institution so that the institution

8   need do no mapping to assimilate the data in that file into its

9   SIS.  I disagree.  There is no evidence that defendant's systems

10  provide the customized reports in any file format other than the

11  one offered in Flagship and the three offered as part of i-Class.

12  The fact that the institution may be able to customize data into

13  various  reports  does  not  mean  that  defendant's  products  either

14  literally or equivalently perform the function of providing any

15  file  format  specified  by  the  institution  with  that  data  being

16  seamlessly translated to the institution's SIS.

17      As  to  the  second  argument  about  customized  integration

18  solutions," while I find this a closer argument, I still reject it.

19  As described above, the evidence showed that with the assistance of

20  another program, AIM for Flagship, or some other custom translation

21  software program for i-Class, the finite number of file formats

22  provided by Flagship and i-Class can be used by the institution's

23  SIS  without  any  further  manipulation  of  the  data  by  the

24  institution.  This could suggest an equivalent function.

25      But,  the  flaw  with  plaintiff's  position  is  that  while

26  defendant may offer the AIM program or be the distributor of the

27  third party program for i-Class, those programs are not part of the

28  accused  devices.   They  are  something  external  to  the  accused

32 - OPINION & ORDER

1   devices.   While  those  programs  may  be  a  means  to  provide  an

2   equivalent function, the means are not part of the accused device.

3   Additionally,  by  residing  with  the  institution  rather  than  on

4   defendant's server, there is still a burden on the institution and

5   the  "equivalent  function,"  if  there  is  one,  is  not  performed  in

6   substantially the same way as that claimed in the patent.

7       Third, plaintiff argues that the ability of i-Class to provide

8   data in an XML format is equivalent to the functionality required

9   by the claims as construed.  Plaintiff contends that XML is a kind

10  of "universal file format" wherein the data is easily accessible

11  and mapped to any system, and is easily used by any SIS.  Plaintiff

12  cites  to  the  i-Class  manual  in  support  of  this  position.   The

13  manual states that

14      XML is the Extensible Markup Language.  It allows a page
        to  contain  a  definition  and  execution  plan  for  the
15      elements, as well as their content.  It allows designers
        to   create   their   own   customized   tags,   enabling   the
16      definition, transmission, validation, and interpretation
        of data between applications and between organizations.

17
        **XML:**  An XML file looks just like an html page, except
18      the tags are not <table><tr><td>.  [I]nstead, they are
        element identifiers that tell a system what type of data
19      is being passed (i.e., <first name>Chad</first name><last
        name>Massie</last  name>).   This  way,  databases  and
20      systems can share information easily because data type is
        identified in the data file.

21
    Exh. 80 at p. 77.
22
        Based on this, plaintiff contends that offering the XML file
23
    format is equivalent to literally offering all file formats or an
24
    unlimited number of file formats because "in this modern world," it
25
    is quickly and easily transformed into any other file format or
26
    used directly by any system.
27
        I  reject  this  argument.   While  defendant's  i-Class  manual
28

33 - OPINION & ORDER

1    suggests that XML is a format that makes data more easily usable by

2    other institutions, the manual does not support plaintiff's

3    conclusion that XML, by itself, is a universal file format

4    equivalent to providing all possible file formats with no

5    additional mapping required by the institution. The i-Class manual

6    does not provide substantial evidence that by offering an XML file

7    format, defendant's accused products infringe the '042 patent under

8    the doctrine of equivalents. Being "quickly and easily

9    transformed" into other file formats is simply not equivalent to

10   being provided in any file format.

11       Plaintiff's fourth argument is that because i-Class can

12   provide a myriad of field formats, presentation formats, etc., it

13   is equivalent to the required function of the claims as construed.

14   I disagree. The claims, as construed, require an unlimited number

15   of file formats, not other types of formats as discussed earlier.

16       Finally, as to claim 38, defendant argues that its systems do

17   not provide unlimited customization of application forms and that

18   plaintiff failed to present any evidence that defendant's products

19   performed an equivalent custom forms function. Even if I agree

20   with plaintiff that defendant is precluded from challenging the

21   "front-end" customized application form function at this point, I

22   conclude that the function of providing unlimited formats, which is

23   an element of claim 38 as well as claims 1, 16, and 32, controls

24   the decision on claim 38. Substantial evidence does not support a

25   verdict of infringement of claim 38 based on the doctrine of

26   equivalents.

27       Because substantial evidence does not support a verdict of

28   infringement of the '042 patent under the doctrine of equivalents,

34 - OPINION & ORDER

1    I grant defendant's JMOL motion directed to the non-infringement of

2    the '042 patent.

3    II.    Alternative Motion for New Trial

4        Even though I grant defendant's JMOL motion, I am required to

5    address defendant's alternative new trial motion.  Fed. R. Civ. P.

6    50(c); Freund v. Nycomed Amersham, 347 F.3d 752, 764 (9th Cir.

7    2003) (noting that "Rule 50(c) of the Federal Rules of Civil

8    Procedure requires a district court granting a judgment as a matter

9    of law also to rule on whether to grant a new trial in the event

10   the judgment as a matter of law is reversed on appeal.").

11       For the reasons discussed above in connection with the JMOL

12   motion, I conclude that alternatively, the verdict should be set

13   aside and a new trial awarded on the issue of infringement of the

14   '042 patent because the verdict is against the clear weight of the

15   evidence and the jury reached a seriously erroneous result.

16   Assessing the evidence presented at trial, I conclude that the

17   clear weight of the evidence establishes that neither Flagship, nor

18   i-Class infringed the formatting and mapping functions of claims 1,

19   16, and 32, or the formatting function of claim 38.    I grant

20   defendant's alternative motion for new trial.

21   III.  Motion to Continue Stay

22       Defendant moves to continue the stay of execution of the

23   judgment and the injunctive relief until resolution of the eight

24   pending motions set for oral argument on December 19, 2003.

25   Defendant relies on evidence and arguments presented to the Court

26   with its original motion to stay the judgment and the injunctive

27   relief pending resolution of the instant JMOL motion on non-

28   infringement of the '042 patent.

35 - OPINION & ORDER

1    As I noted in granting that original motion, the evidence
2  showed that if a stay were not granted, defendant would likely be
3  put out of business by having to pay the $1,226,000 money judgment
4  while litigation continues and by having to stop servicing its
5  current institution clients under contract.  All of the evidence
6  presented in support of that motion addressed the effect on
7  defendant of a $1.2 million verdict and the injunctive relief
8  related to the '042 patent.

9    However, by virtue of granting this JMOL motion as to the
10  infringement of the '042 patent, defendant's monetary liability is
11  reduced to $181,000, excluding any pre- or post-judgment interest
12  or enhancement under 35 U.S.C. § 284.  Additionally, with no
13  infringement of the '042 patent and defendant's voluntary cessation
14  of infringement of the '278 patent nearly one year ago, the impact
15  of any continuing injunctive relief related to the '278 patent on
16  defendant appears to be minimal.

17    Accordingly, I grant the current motion to extend the stay of
18  execution of the judgment and the injunctive relief in part and as
19  follows:  the stay is extended until December 19, 2003, when
20  defendant shall appear in person at the previously scheduled oral
21  argument on the other motions, to show cause why the stay should
22  not be lifted in light of the significantly smaller judgment
23  remaining against defendant.  Defendant is ordered to file a
24  written submission on this issue no later than Monday, December 15,
25  2003.  Plaintiff may file a written response no later than
26  Wednesday, December 17, 2003.

27  / / /

28  / / /

36 - OPINION & ORDER

1                                 CONCLUSION

2          Defendant's motion for JMOL as to the non-infringement of the

3     '042 patent, and defendant's alternative motion for new trial

4     (#348) is granted.  Defendant's motion to continue the stay of

5     execution (#410) is granted in part as outlined above.

6               IT IS SO ORDERED.

7

8                         Dated this  9th    day of  December   , 2003

9

10

11                                    /s/ Dennis James Hubel
                                      Dennis James Hubel
12                                    United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

37 - OPINION & ORDER